**SAINT MARY OF NAZARETH HOSPITAL CENTER, et al., Appellants,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services.**

**MOUNT ZION HOSPITAL AND MEDICAL CENTER, Appellant,**

v.

**Richard SCHWEIKER, in his official capacity as Secretary of Health and Human Services.**

**WASHINGTON TOWNSHIP HOSPITAL DISTRICT d/b/a Washington Hospital, Appellant,**

v.

**Richard SCHWEIKER, in his official capacity as Secretary of Health and Human Services.**

Nos. 82–1034, 82–1047 and 82–1052.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1982.

Decided Sept. 23, 1983.

Dennis M. Barry, with whom J.D. Epstein, Houston, Tex., was on brief, for appellants.

Vicki L. Schulkin, Atty., Dept. of Health and Human Services, with whom Juan A. Del Real, Gen. Counsel, Dept. of Health and Human Services, Washington, D.C., was on brief, for appellee. Kenneth M. Raisler and Valerie K. Schurman, Asst. U.S. Attys., Washington, D.C., also entered appearances, for appellee.

Before WRIGHT and GINSBURG, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

This case consolidates the group appeal of seventy hospitals and the individual appeals of two hospitals from the District Court's affirmance of the denial of their payment claims by the Deputy Administrator of the Health Care Financing Administration ("Deputy Administrator").[1] The hospitals are providers of Medicare services and challenge the methods used by the Department of Health and Human Services ("HHS")[2] to reimburse them for those services. For the reasons stated below, we find merit in the hospitals' challenge to the accounting procedures and remand for the taking of further evidence. We withhold judgment on a jurisdictional question with respect to St. Vincent Hospital and Medical Center of Toledo.

I

The Medicare program subsidizes the medical care of elderly and disabled citizens. See 42 U.S.C. § 1395c (Supp. V 1981). Part A of the program, which is involved in this case, reimburses certified health care institutions, such as hospitals and nursing homes, see id. § 1395d (1976 & Supp. V 1981), for "the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title ... or (B) the customary charges with respect to such services," id. § 1395f(b)(1) (Supp. V 1981). Section 1395x(v) states that "[t]he reasonable cost of any services shall be the cost actually incurred, excluding" amounts not necessary to the efficient provision of health care. Such costs "shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services." Id. § 1395x(v)(1)(A) (1976). Although the Secretary is given considerable discretion in establishing these regulations,[3]

[s]uch regulations shall (i) take into account both direct and indirect costs of providers of services ... in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs. . . .

1. The District Court also consolidated the appeals, but the prior administrative proceedings were separate. Because of the similarity of the facts and questions presented and the decisions rendered up until ours, references herein shall be to the Record, Deputy Administrator's decision, and PRRB decision in the group appeal, *St. Mary of Nazareth Hospital Center v. Schweiker.*

2. At the time, it was the Department of Health, Education, and Welfare. With few exceptions, we will refer to the agencies involved in this case by their current denominations.

3. In addition to the regulatory power under 42 U.S.C. § 1395x(v)(1)(A), the Secretary is granted authority by id. § 1395hh (1976) to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter," and id. § 1395ii expressly incorporates id. § 405(a), which gives the Secretary authority to make rules and regulations necessary and appropriate to implementing the purposes of the Social Security Act. These rather broad delegations are given more focus regarding the regulations for determining reasonable costs: in formulating these regulations, the Secretary is directed to

consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs.

*Id.* § 1395x(v)(1)(A) (1976). This section then imposed the restriction quoted in the text following this note.

*Id.* This provision clearly is meant to prevent the Medicare program from subsidizing non-Medicare related costs, but it equally clearly proscribes Medicare from being subsidized by non-Medicare sources.

The hospitals contend that the Secretary's implementation of his regulations has resulted in illegal subsidization of the Medicare program by non-Medicare payors. Under the regulations, reimbursement is calculated separately for routine services and for ancillary services. *See* 42 C.F.R. § 405.-452(b) (1977).[4] The dispute here focuses on the treatment of costs and patients in the hospitals' labor/delivery room area, which is an ancillary care area, *see* Provider Reimbursement Manual § 2202.8 (HCFA Pub. 15–1) [hereinafter cited as Manual]. For accounting periods beginning on or after September 1, 1976, the Secretary has required that patients in ancillary areas at the census-taking hour[5] be counted in the inpatient routine population for purposes of calculating the average cost per diem for general routine inpatient care. Reimburse-

ment for ancillary *costs,* however, continues to be made separately. Manual § 2345. The hospitals complain that this formulation dilutes Medicare reimbursement. Patients in the labor/delivery room area do not receive any routine services until after they leave that area.[6] Since the average cost per diem for routine services is equal to the total annual cost of such services divided by the total number of inpatient days, 42 C.F.R. § 405.452(d)(7) (1977), and since labor/delivery room patients are counted for purposes of the denominator but do not produce any costs counted in the numerator, the average cost per diem is distorted downward. Since a portion of their Medicare reimbursement is computed by multiplying the average cost per diem for routine services by the number of beneficiary routine inpatient days,[7] the hospitals argue that they are not being reimbursed adequately. This distortion is exacerbated, in their view, by the fact that Medicare beneficiaries make extremely little use of labor/delivery room facilities.[8]

---

4. "Routine services means the regular room, dietary, and nursing services, minor medical and surgical supplies, and the use of equipment and facilities for which a separate charge is not customarily made." 42 C.F.R. § 405.452(d)(2) (1977). "Ancillary services or special services are the services for which charges are customarily made in addition to routine services." *Id.* § 405.452(d)(3).

The regulations provide two methods of apportionment, Departmental and Combination, and hospitals are required to use one or the other, depending upon hospital size. *Id.* § 405.452(b), (c). Under both methods, reimbursement is based on an average cost per diem for routine services in general care areas, an average cost per diem for services in special care units, and the ratio of beneficiary charges to nonbeneficiary charges for ancillary services. The difference between the two methods is that, under the Combination Method, the charges for all ancillary areas are aggregated to get one ratio for apportionment, *see id.* § 405.452 (b)(2); under the Departmental Method, a ratio of charges is determined separately for each ancillary department, *id.* § 405.452(b)(1).

5. The census-taking hour is midnight. Medicare counts the day of admission as a full day of care. A patient occupying a bed at midnight on succeeding days will be counted as having

received a day of care. *See* Hospital Manual § 216.1 (HIM–10); Rec. at 206. Thus the day of discharge is not counted as a day of care, even if discharge takes place at 11:55 p.m.

6. Counsel for the hospitals and the Blue Cross Association appear to have stipulated before the PRRB that the dispute concerns only women in the labor/delivery area who have *not* previously that day occupied a routine bed. *See* Rec. at 94–95.

7. The District Court helpfully described the reimbursement calculation for general routine services as a two-step procedure, roughly along the following lines:

1.  $\dfrac{\text{total cost of routine services}}{\text{total number of inpatient days}} = \text{average cost per diem}$

2. (average cost per diem) x (number of Medicare beneficiary inpatient days)=amount reimbursed.

*See* St. Mary of Nazareth Hosp. Center v. Schweiker, [1981–2 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 31,594, at 9904 (D.D.C. Nov. 9, 1981), J.A. at 45.

8. Appellants use the following hypothetical example to show how reimbursement could decrease $40,000 by including labor/delivery patients in the routine inpatient count.

All but one of the hospitals involved here, *see infra* part IV, excluded labor/delivery room patients from their inpatient counts in calculating their routine average cost per diem. Their fiscal intermediaries, private organizations which are under contract with the Secretary to determine the amount of reimbursement allowed the hospitals, *see* 42 U.S.C. § 1395h (1976 & Supp. V 1981), found Manual § 2345 binding, included such patients in the inpatient count, and reduced the allowed reimbursement accordingly. The hospitals pursued their administrative remedies by appealing to the Provider Reimbursement Review Board ("PRRB"),[9] which found that "routine costs properly apportionable to Medicare patients are being siphoned off and apportioned to non-Medicare patients in the labor/delivery area." PRRB Case No. 79–78G, Decision at 6, *reprinted in* Joint Appendix ("J.A.") at 74, 79. The PRRB held that 42 C.F.R. § 405.452(d)(7), which defines the average per diem costs, is controlling, and it concluded that section 452(d)(7)'s purposes would be served only if "the divisor in the formula for computing average per diem costs, i.e., inpatient days, [does] not include days [when] the costs associated with those days are not included in routine costs," i.e., the numerator. PRRB Dec. at 7, J.A. at 80.

The Secretary has the authority on his own motion to affirm, reverse, or modify the decisions of the PRRB, 42 U.S.C. § 1395*oo*(f)(1) (Supp. V 1981), and that authority was delegated to the Administrator of the Health Care Financing Administration and ultimately to the Deputy Administrator. The Deputy Administrator reversed the PRRB's decision, the hospitals filed timely civil actions to contest that reversal in the District Court, *see id.,* and in the consolidated case the District Court affirmed the Deputy Administrator's decision. *Saint Mary of Nazareth Hospital Center v. Schweiker,* [1981–2 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 31,594 (D.D.C. Nov. 9, 1981) (No. 80–3280), *reprinted in* J.A. at 44. The court found "the fact that historically there has been a lack of uniformity of treatment of this aspect of Medicare reimbursement by both the agency and the hospitals indicates that the issue is not so one-sided" as to indicate agency irrationality. *Id.* at 9904, *reprinted in* J.A. at 45–46. The court also found averaging a necessary part of the Medicare reimbursement scheme and that some imprecision, such as that alleged here, is inherent in averaging. Finally, the court concluded that Manual § 2345 is reasonably consistent with the controlling regulations. These reasons convinced the court that there is a rational basis for the Deputy Administrator's decision. *Id.*

## II

Although ordinarily the agency's interpretation of its own regulations is entitled

| Total routine days (excluding "labor room days") | Total routine days *plus* "labor room days" | Total routine costs | Average per diem | Medicare inpatient days | Medicare reimbursement for routine services |
|---|---|---|---|---|---|
| 100,000 | | $10 mil. | $100 | 40,000 | $4,000,000 |
| | 101,000 | $10 mil. | 99 | 40,000 | $3,960,000 |

Appellants' Brief at 8. Note that if among the 1000 "labor room days" there were 404 Medicare beneficiary labor room days, reimbursement would not be diluted, for the $99 average per diem cost would be multiplied by 40,404 to yield a reimbursement of $3,999,996.

**9.** The PRRB was created to hear Medicare providers' appeals of intermediaries' determinations of the reimbursement due the providers for amounts in controversy equal to at least $10,000. *See* 42 U.S.C. § 1395*oo* (a)(2) (1976). The Board has five members, all of whom "shall be persons knowledgeable in the field of cost reimbursement." *Id.* § 1395*oo*(h). The statute permits group appeals "only if the matters in controversy involve a common question of fact or interpretation of law or regulations and the amount in controversy is, in the aggregate, $50,000 or more." *Id.* § 1395*oo* (b).

to deference, "[v]arying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise." *Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977). *Cf. Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (weight of agency's interpretation of statute "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements"); *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976) (quoting *Skidmore*); *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) (same); *United Transportation Union v. Lewis,* 711 F.2d 233, 242 (D.C.Cir. 1983) ("A statutory construction to which an agency has not consistently adhered is owed no deference."). HHS has not consistently enforced the interpretation at issue here, and the matter has been the subject of considerable confusion.

The record indicates that there was no specific reference to the treatment of the labor/delivery area, at least for purposes of calculating the average per diem cost of routine inpatient care, until late 1972.[10] The Bureau of Health Insurance (the "Bureau"), which administered Medicare reimbursement before the Health Care Financing Administration ("HCFA"), had proposed a new cost reporting form in 1971. The Blue Cross Association raised the labor/delivery room issue in its October 1972 comments regarding the new form and accompanying instructions:

> Since the specific cost of labor rooms is excluded, it would be inappropriate to further dilute the inpatient routine per diem cost by including labor room days in total adult days. We, therefore, recommend that the instructions specifically

caution providers to exclude all labor room days from total inpatient days in computing inpatient routine service costs applicable to Medicare.

Rec. at 985. The Bureau, apparently picking up on the second sentence above, included a caution in its instruction accompanying cost report form 2570 in December 1972: "If the provider maintains records of labor room days, they should not be included in any of the inpatient day counts used for cost apportionment of routine services since labor room costs must be excluded from the routine service costs." Rec. at 975.

Although this instruction would seem to indicate a policy that supports the hospitals here and is in direct conflict with the present policy of Manual § 2345, it developed that the Bureau wanted labor/delivery area patients to be included in the inpatient count. Testimony in the record suggests that one to two years after the December 1972 instructions, the Bureau became aware that many hospitals were not including labor/delivery patients in the count for calculating the hospital's average costs. Rec. at 208–15 (testimony of Arthur Huston, Senior Manager, Policy and Procedures in Government Program Reimbursement, Blue Cross Association). The Bureau explained the December 1972 instructions to mean that if a hospital maintained records of both labor room days and inpatient days, then only inpatient days, but not both, should be used in computing average per diem costs. *Id.* at 209, 214. In 1975 intermediaries were given new instructions for counting labor/delivery room patients, and the policy of counting all patients who are in the area at the census hour as inpatients for average routine cost purposes was enunciated in Manual § 2345 in August 1976. Section 2345 was to apply to accounting periods ending after June 30, 1975.

---

10. It would not be surprising if little or no attention were given this issue prior to 1972. For accounting periods starting before January 1, 1972, providers had the option of apportioning all costs, department-by-department, on the basis of the ratio of beneficiary charges to non-beneficiary charges. *See, e.g.,* 42 C.F.R. § 405.452(a) (1977); 20 C.F.R. § 405.452(a) (1972). In such a calculation, only charges, not "inpatient days," would be relevant. *See generally* Rec. at 219–22 (testimony of Arthur Huston, Blue Cross Association) (many hospitals used the charges-to-charges option before 1972).

HCFA maintains that the policy embodied in section 2345 has always been its interpretation. That may well be true, but it is clear that HCFA's policy was not always followed. The hospitals involved in this appeal, for example, had not included labor/delivery room patients in the routine inpatient counts before section 2345 was issued, and, with the one exception noted, *see supra,* p. 463, challenged that provision as soon as it was invoked against them.

The hospitals' pre-1976 behavior is understandable and apparently was not unreasonable. As the Blue Cross Association stated in 1976, "the Bureau confirms that various program instructions could be interpreted to mean the inclusion of 'labor room days' in total routine days is not in accordance with then existing program instructions." Blue Cross Association Administrative Bulletin No. 1054 (July 6, 1976), Rec. at 272, 273. The Bureau admitted that its " 'first clear cut delineation of [its] policy appeared in instructions . . . which became effective with cost reporting periods ending on or after June 30, 1975.' " Bureau of Health Insurance memorandum to the Blue Cross Association [1976], *quoted in* Blue Cross Association Administrative Bulletin

No. 1054, *supra,* at 273. Moreover, because agency instructions to Medicare providers prior to promulgation of Manual § 2345 were " 'wholly inadequate, unclear, and inconsistent' " in this regard, the Deputy Administrator affirmed the first PRRB decision involving the labor/delivery room issue, which upheld the hospitals' position for an accounting period that ended before section 2345 issued. *See* Accounting for Labor Room Days, [1977 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 28,633, at 10,211–12 (HCFA Sept. 12, 1977) (quoting PRRB concurring opinion). In December 1976, HCFA amended section 2345, making it applicable only to accounting periods ending after it was promulgated. Thus despite what he claims to have been HCFA's consistent interpretation of the regulations, first the Deputy Administrator and then the agency in effect condoned reimbursement practices diametrically opposed to the agency's interpretation. In these circumstances, we cannot believe that any particular deference is due the present interpretation of the controlling regulations merely because it is the interpretation of the administering agency.[11]

**11.** The labor/delivery issue has produced a flood of appeals to the PRRB, leading one service to conclude that it is "one of the most controversial issues facing Medicare reimbursement." MEDICARE & MEDICAID GUIDE (CCH) ¶ 6894, at 2275 (1982). The PRRB announced a policy in favor of the hospitals in its first case, Accounting for Labor/Delivery Room Days, [1977 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 28,557 (PRRB July 14, 1977), *modified, id.* ¶ 28,633 (HCFA Sept. 12, 1977), and it has continued to adhere to that position in the face of repeated reversals by the Deputy Administrator, *see* Arnot-Ogden Memorial Hosp. v. Blue Cross & Blue Shield Ass'n, [1983–1 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 32,466, at 10,347–50 (PRRB Mar. 3, 1983) (explaining PRRB's continued adherence to its position), *rev'd,* HCFA (Apr. 29, 1983). The Deputy Administrator has been nearly equal in his opposition to the PRRB and the hospitals for accounting periods following the effective date of Manual § 2345. *See, e.g.,* Winter Park Memorial Hosp. v. Blue Cross Ass'n, [1983–1 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 32,374 (HCFA Dec. 22, 1982), *rev'g* [1982 Transfer Binder] *id.* ¶ 32,103 (PRRB Aug. 3, 1982). In fact, the two sides became so entrenched that the looseleaf service stopped reproducing their discussions of the labor/delivery issue "because the issues raised and the decisions rendered were virtually identical to those raised and decided in previous decisions regarding this issue." [1981–2 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 31,436, at 9182 (regarding HCFA decision of July 9, 1981). *See also, e.g., id.* ¶ 31,480, at 9409 (virtually identical statement regarding PRRB decision of Aug. 7, 1981).

The district courts are in conflict. *Compare Martin Luther Hosp. Medical Center, Inc. v. Schweiker,* [1983–1 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 32,452 (C.D.Cal. Aug. 17, 1982) (affirming Deputy Administrator) *and International Philanthropic Hosp. Found. v. Schweiker,* [1982 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) ¶ 32,108 (C.D.Cal. July 16, 1982) (same) *with Baylor Univ. Medical Center v. Schweiker,* 563 F.Supp. 1081 (N. D. Tex.1983) (reversing Deputy Administrator) *and John Muir Memorial Hosp., Inc. v. Davis,* 559 F.Supp. 1042 (N.D.Cal.1983) (same).

Furthermore, although the Medicare program is surely complicated and agency expertise is entitled to great respect, we find no evidence in the record that agency expertise was brought to bear on this matter in any substantial way. Once the Bureau became aware of the "misinterpretation" of its 1972 instructions, it investigated the practices of hospitals to determine whether there was some common accounting practice that could be implemented. Apparently it determined that there was no such practice. The interpretation that evolved was simply an application of existing definitions. An inpatient is anyone formally admitted to the hospital "as an inpatient with the expectation that he will remain at least overnight and occupy a bed." Manual § 2202.1. Women in labor enter the hospital and generally are expected to remain overnight. There were no extenuating reasons found to exclude these patients from the inpatient count, and therefore they were deemed inpatients. Rec. 1028–37 (hospitals' exhibit N before the PRRB) (Accounting for Labor/Delivery Room Days—Historical Development).

We will explain later why we believe this to be an improper application of general hospital accounting principles. *Infra* part III. Suffice it to say now that the principles are general, were not developed in light of any special information about either labor/delivery room care or accounting practices, and there is nothing that went into the development of the policy in Manual § 2345 that requires expertise for one to understand. In sum, neither consistency nor timing nor expertise weigh heavily in favor of deferring to HHS in this matter.

### III

■ The decision subject to judicial review is that of the Deputy Administrator and not that of the PRRB. *See* 42 U.S.C. § 1395oo (f)(1) (Supp. V 1981); *White Memorial Medical Center v. Schweiker,* 640 F.2d 1126, 1128 n. 3 (9th Cir.1981); *Diplomat Lakewood Inc. v. Harris,* 613 F.2d 1009, 1018 n. 16 (D.C.Cir.1979). The scope of review is provided by 5 U.S.C. § 706 (1976).

*See* 42 U.S.C. § 1395oo (f)(1) (Supp. V 1981). The burden of demonstrating fault with the Deputy Administrator's decision lies with the hospitals. *Diplomat Lakewood Inc.,* 613 F.2d at 1018. Moreover, in a case such as this, "where the decision under review involves an agency's interpretation of its own regulations, forming part of a complex statutory scheme which the agency is charged with administering, the arguments for deference to administrative expertise are at their strongest." *Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 813–14 (D.C.Cir.1981) (per curiam). The burden is not insurmountable, however, and we find that appellants have sustained it in this case.

There appear to be at most six bases to the Deputy Administrator's decision: (1) the definition of inpatient day in the regulations is broad, and no reason appears to exclude labor/delivery room patients from that category; (2) many providers, including some involved in this appeal, actually charge their labor/delivery room patients for a day of routine care even if the patient has not left the labor/delivery area; (3) routine care at all times is available to the labor/delivery area patients; (4) these patients will move to routine areas, and standby costs therefore should be attributed to them; (5) any disparity between costs and reimbursement is a result of averaging, which is a basic and judicially accepted component of the Medicare reimbursement scheme; (6) this accounting of labor/delivery patients is consistent with the accounting for patients in all other ancillary care areas. We discuss these in turn.

### A. *The Definition of an Inpatient Day*

The Deputy Administrator relied on 42 C.F.R. § 405.430(b)(5) (1977) for the controlling definition of inpatient day. The term is defined there as "a day of care rendered to any inpatient," excluding patients in special care units. Special care units are defined in 42 C.F.R. § 405.452 (d)(10) (1977) specifically to exclude "maternity labor rooms." Because the labor/delivery area by definition is not a spe-

cial care unit, its patients are not subject to the exception in section 430(b)(5) and therefore must be included in the count of inpatient days. Dep.Admin.Dec. at 8–9, J.A. at 58–59. *See also id.* at 10, 13, J.A. at 60, 63.

The internal logic of the argument is flawless, but its premise is nowhere explained. Section 430(b)(5) is part of the regulations relating to the inpatient routine nursing salary cost differential, not here relevant. Section 452(d)(10) is part of the section that is entitled "Determination of cost of services to beneficiaries." Although the inpatient routine nursing salary cost differential goes into the computation of the cost of services to beneficiaries, there is no reason to believe that, except where explicitly mentioned, the definitions included in section 430(b) are meant to control section 452 or that the definitions in section 452(d) should control section 430. The Deputy Administrator's reading leads to irreconcilable conflicts.

One clue that the two sections are not so related is that the special care unit definition in section 452(d)(10), upon which the Deputy Administrator relies to explain section 430(b)(5), appeared verbatim as 42 C.F.R. § 430(b)(9) (1977). It makes no sense to turn to section 452(d)(10) to modify section 430(b)(5) when the same modification is contained in the same regulation. And conversely, there is no apparent reason to turn to section 430(b)(5) to determine the meaning of inpatient day, which appears without further definition in section 452(d)(7). A second clue to the lack of a connection is that when the regulations in section 452 meant to rely upon section 430, they said so explicitly. *See id.* § 405.452 (a)(1), (a)(2), (b)(1), (b)(2), (e)(2)(ii), (e) (3)(i), (e)(3)(iii) (1977).

The most telling evidence that the Deputy Administrator's reliance on section 430(b)(5) is wholly without foundation, however, is that it leads to impossible results when applied to other computations in section 452. The average cost per diem for hospital special care units is defined in *id.* § 405.452(d)(8) as the total allowable costs for routine services in such units divided by "the total number of inpatient days of care rendered in" such units. Section 430(b)(5) tells us that patients in special care units are not counted for purposes of "inpatient days" of care. Using this definition, the divisor in the equation given in section 452(d)(8) would be zero, which creates a mathematical impossibility, but which for all practical purposes would mean that hospitals would not be reimbursed at all for the costs of rendering care to Medicare patients in special care units. This result is ridiculous, contrary to the letter of 42 U.S.C. § 1395x(v)(1)(A), and contrary to the spirit of the Secretary's decision to distinguish special care units from other units, *see, e.g., Psychiatric Institute of Washington, D.C., Inc.,* 669 F.2d at 813, but it would be compelled by the Deputy Administrator's reading of the relation between the two sections of the regulations.

The Deputy Administrator did not explain why he relied upon section 430(b)(5); before this court, in the face of the arguments just presented, HHS explains his reliance in the following terms: "[T]he subject matter of the two is essentially the same, especially when this situation is contrasted with the facts of *Laffey v. Northwest Airlines,* 567 F.2d 429 (D.C.Cir.1976), cited by the Hospitals .... " Appellee's Brief at 35. The subject matter of the two sections is, broadly speaking, the same: They both concern reimbursement. We have just demonstrated, however, that in the specific context of calculating the average cost per diem, there is no reason to rely on the definitions of section 430(b).

As the hospitals point out, it is troubling that at no time did the Deputy Administrator advert to 42 C.F.R. § 405.452(d)(7) (1977), which sets out the average cost computations at issue in this lawsuit. The hospitals, in contrast, construct a quite plausible interpretation supporting their position based on the words of section 452(d)(7). For the cost period relevant here, the regulations stated that the equation for computing the average cost per diem for general routine services shall exclude "the cost of services provided in intensive care units,

coronary care units, and other special care inpatient hospital units as well as nursery costs" and shall exclude the "days of care in intensive care units, coronary care units, and other special care inpatient hospital units and newborn days." *Id.*

The hospitals argue that section 452(d)(7) evinces a general intent to match patients with costs they have generated. Indeed, the average cost equals total cost divided by the number of "inpatient days of care." *Id.* Thus the reason the section excludes newborns from the calculation, for example, is that newborns do not receive any routine care and therefore do not generate any routine costs. It would be unfair to have routine costs apportioned to them when they create none. Likewise, it is unfair and, the hospitals argue, inconsistent with the spirit of section 452(d)(7) to include labor/delivery patients in the inpatient count for routine care when they receive none and when the costs of the labor/delivery area are not included in routine costs. This interpretation surely makes more sense than does the Deputy Administrator's reliance on section 430(b)(5). The hospitals' position is, prima facie, rational, whereas the Secretary's position, prima facie, appears irrational: we see no logic in apportioning to patients costs they have not incurred while refusing to include in the apportionment costs they have generated. *Accord Baylor University Medical Center v. Schweiker,* 563 F.Supp. 1081, 1083 (N.D. Tex.1983) (Manual § 2345 "fails to meet the reasonableness test"). Should HHS have some other interpretation as ten-

able as the hospitals', however, "neither this court nor the District Court . . . is entitled to hold that [such] interpretation was contrary to law." *Psychiatric Institute of Washington, D.C., Inc.,* 669 F.2d at 814. We must therefore review the remaining reasons the Deputy Administrator gave for his decision.[12]

### B. *Hospital Charging Practices*

The Deputy Administrator noted that counting labor/delivery room patients in the hospital's inpatient count is an accepted, though not uniform, industry practice. Moreover, he found that nineteen of the twenty-four intermediary plans involved in the group appeal would pay for a day of both routine and ancillary care for a labor/delivery area patient, and twenty-eight of the hospitals are paid for a routine day of care by patients who are in the labor/delivery area at the census-taking hour. Dep.Admin.Dec. at 9, J.A. at 59. The Secretary argues that the point of these findings "is that the Secretary's policy is not diametrically opposed to, or irrationally out of step with[,] some completely unified industry practice." Appellee's Brief at 42.

These findings are largely irrelevant. Medicare reimburses hospitals for the reasonable costs of providing services. That a hospital counts a labor/delivery room patient as an inpatient for some purposes does not tell us whether the patient has generated routine costs, and, unless non-Medicare reimbursement is calculated in the same manner as is Medicare, then the charging

---

**12.** The hospitals also argue that, § 452(d)(10) notwithstanding, the labor/delivery room should be counted as a special care unit. This court and other courts have faced several challenges to the Secretary's definition of special care units, and there is general agreement that "the Special Care Unit regulation depended entirely on the Secretary's judgment . . . and the initial decision where to draw the line was for the Secretary alone." *Psychiatric Institute of Washington, D.C., Inc.,* 669 F.2d at 813. *See, e.g.,* White Memorial Medical Center v. Schweiker, 640 F.2d 1126, 1129 (9th Cir.1981) (upholding Secretary's determination that a unit was not entitled to special care unit status). *But cf.* Daughters of Miriam Center for

the Aged v. Mathews, 590 F.2d 1250, 1258 (3d Cir.1978) (concerning agency interpretive rules, "courts remain free to substitute their judgment for that of the agency in determining how the statute or regulation is to be implemented").

We note that there is some question whether we have jurisdiction to entertain this claim. In view of our disposition of the case on other grounds, and because we are withholding judgment on the other jurisdictional issue before us, we do not decide whether the claim is properly before us, and we do not attempt to determine whether the hospitals have demonstrated the identity of labor/delivery care with other special care.

and reimbursement practices with regard to third-party payors is also unenlightening.[13]

Charges for ancillary care, such as labor/delivery, are relevant to the formula for Medicare reimbursement: the ratio of charges for Medicare patients to charges for non-Medicare patients in ancillary areas is multiplied by the costs for those areas, and the product is paid to the hospitals. *See* 42 C.F.R. § 405.452(b)(1), (2) (1977). But the fact that a hospital charges for a day of routine care in addition to its charge for labor/delivery ancillary care cannot affect ancillary reimbursement, because a charge for routine care will not be included in the total ancillary charges in this formula.

■ Moreover, the hospitals have explained why at least in some cases the hospitals count labor/delivery room patients as routine patients for purposes of reimbursement for non-Medicare patients by third-party payors. The hospitals have arrangements with those payors for reimbursement on a "global" basis, which means that routine and ancillary costs are not segregated. J.A. at 178–79 (stipulation of fact defining global reimbursement and listing plans that reimburse appellants on that basis). Thus in order for a hospital to be paid anything at all under these plans, it must claim a day of routine patient care. *Id.* at 170 (testimony of Lawrence Goldberg, Director, Division of Financial Management, American Hospital Association). In these instances, there is no inconsistency with the hospitals' arguments here. To the extent that the hospitals' charging practices with regard to non-Medicare patients do conflict with their claims here, however, it reflects greed that affects only non-Medicare payors. *See* Appellants' Brief at 54–55. The conflict provides no basis for ignoring 42 U.S.C. § 1395x(v)(1)(A), which forbids charging Medicare costs to non-Medicare patients.

## C. Availability of Routine Care and Apportionment of Standby Costs

The third and fourth bases listed above are most easily treated together, if only because the Deputy Administrator did not clearly distinguish them in his decision. He stated that "almost all of the labor/delivery room patients will use the routine area and ... routine services are available to labor/delivery patients." Thus Medicare would be subsidizing non-Medicare costs if days of routine care were not counted for labor/delivery patients. Dep.Admin.Dec. at 9, J.A. at 59. Moreover, "[i]f a routine day were not counted in this instance, the program would assume a disproportionate share of standby costs associated with the beds reserved for the maternity patients." *Id.* at 10, J.A. at 60.

Viewed in a certain light, the argument has some appeal to it. For purposes of Medicare cost accounting, the day runs from midnight to midnight. A patient in a routine bed at midnight is counted as a routine inpatient for the entire preceding day, even if he arrived in the routine area ten minutes earlier. The day of admission is thus counted as a full day of routine care regardless of the time of day when the patient entered the hospital, and the day of discharge is not counted, again regardless of the time when discharge takes place. *See* Manual § 2205; *supra* note 5. There is a certain symmetry here, in that one can imagine that some of the services not received on the admission day are balanced by the services received, but not counted, on the day of discharge.

At first glance it would appear that not counting labor/delivery area patients as inpatients would distort the symmetry. The

---

**13.** That a hospital charges a patient for routine services does not affect its allowable Medicare reimbursement, for Medicare reimburses for routine care on the basis of costs, no matter how much the hospital charges. Medicare reimbursement for routine costs is computed by aggregating all routine general care costs, dividing by the number of patients arguably re-

ceiving such services, and then multiplying by the number of Medicare beneficiaries arguably receiving such services. *See* 42 C.F.R. § 405.-452(b), (d)(7) (1977). Because patients in the labor/delivery area receive ancillary, not routine, care, there will be no routine reimbursement for them, even if the hospital charged for it.

hospitals in this appeal admit patients directly to the labor/delivery area. Thus they do not consider the day the patient arrives in the hospital as an inpatient day, for purposes of section 452(d)(7), unless she delivers and is then assigned a routine room before midnight. *See* Rec. at 116–17, 161–64 (testimony of Dr. Rosemary Dale); *id.* at 171–77, 180–82 (testimony of George Kramer). If a patient arrives in the delivery area on one day, remains there past midnight, and then transfers to a routine care area, no routine inpatient day will be counted for her until the day after she entered the hospital. The fortuity of being admitted directly to labor/delivery will have prevented either the day of admission or the day of discharge from being counted as routine inpatient days, thereby destroying the symmetry and creating the appearance of a malapportionment between patients and hospital costs.

This asymmetry does not transpire, however, because the hospitals count a day of routine care as soon as they transfer the labor/delivery patient to a routine care bed. Thus the patient is recorded as a routine inpatient as soon as she begins to receive routine inpatient care, and not the midnight thereafter; there continues to be the balance between the day of admission to routine inpatient care and the day of discharge.

For two reasons, the Deputy Administrator's argument based on the availability of routine services also seems wrong. First, its factual premise is inaccurate. Not all labor/delivery patients actually transfer to routine beds. There is evidence in the record that anywhere from five to forty percent of all labor/delivery patients, due to false labor or some other cause, will be discharged from the hospital altogether, rather than discharged to a routine care room. *See* Rec. at 121–22, 137–41, 155–57 (testimony of Dr. Dale); *id.* at 185–86, 188 (testimony of George Kramer). This lends credibility to the hospitals' contention that up until the time of delivery it is purely a matter of speculation whether the patient, who has not until then received routine care, will in the next day receive routine care.

Second, the Secretary's position here is inconsistent with his treatment of comparable situations. If a room is reserved for a patient temporarily released from treatment, the patient may not be counted as a routine inpatient, even though the room is reserved for and always available to him. *See* Manual § 2205.4. "[T]he program regards the cost of holding a room during a leave of absence as synonymous with standby costs," *id.,* and standby costs are apportioned among the resident patients of a given area, *see generally* 42 C.F.R. § 405.451 (c)(3) (1977); Manual § 2342. If in those circumstances, when it is equally certain that routine care is "available" to the patient, it is improper to count a routine inpatient day, then the availability of routine care to the labor/delivery area patients cannot logically provide a reason for counting them as routine inpatients.

The same Manual section disposes of the Deputy Administrator's argument regarding the apportionment of standby costs. Section 2205.4 says that, although leave-of-absence patients may not be counted as routine inpatients, the cost of holding their rooms may be included in total routine costs. Standby costs are not to be apportioned to particular patients but should be treated as part of hospital overhead and apportioned among the total inpatient population actually receiving routine inpatient care. The availability of routine services to the labor/delivery area patients no more justifies apportioning standby costs directly to them than it does apportioning such costs to leave-of-absence patients.

D. *Averaging is Never Precise*

According to the Deputy Administrator, the hospitals' complaint is nothing more than a grievance with the averaging methods that are a necessary and recognized component of this complex reimbursement system, methods that must include

some disparity. A labor/delivery room patient may not receive routine services until she actually leaves the delivery room. However, it must be recognized

that these routine services are always available to her in the hospital. It is proper that an inpatient share in the costs of these services, no matter where that patient happens to be at the census taking hour.

Dep.Admin.Dec. at 10, J.A. at 60. We have already disposed of the arguments based upon the availability of services. It should be evident, too, that the last sentence quoted merely begs the question at issue, which is the appropriate definition of "inpatient" for purposes of 42 C.F.R. § 405.452(d)(7) (1977). That section specifically excludes from the inpatient count people who are being treated in "special care inpatient hospital units." *Id.* Contrary to the Deputy Administrator's decision, therefore, without further refinement of the term "inpatient," one cannot say that all "inpatient[s] . . . no matter where [located]" must share in routine costs. *Cf.* Manual § 2205 (if a patient is located in two or more areas in one day, he is counted as having been an inpatient only of the area where located at census hour); *id.* (a patient transferred from one Medicare provider to another before midnight is not counted "in either the Medicare days or total patient days of the transferor provider").

The Secretary amplifies the averaging argument more comprehensibly. The calculation of a routine average cost per diem assumes that all patients receive roughly the same services per day at roughly the same cost per patient. Everyone knows that this is not true in individual cases, but for reasons of administrative simplicity it is assumed that the extreme divergences from the mean balance out. *See generally* Appellee's Brief at 23–24, 35–39.

Two examples of averaging disparity should be noted. One, the use of the midnight-to-midnight accounting period, has already been noted, *supra* note 5. A patient who, for example, is admitted at 11:55 p.m. and is released ten minutes later at 12:05 a.m. will be counted as having received a full day of routine care, but so will the patient who is admitted at 12:05 a.m. and is released at 11:55 p.m. the next day. The

second example concerns the treatment of patients in ancillary care areas. The Medicare regulations direct that patients in an ancillary care area at the census hour be counted in the routine inpatient population, *see* Manual § 2345, on the theory that these patients have already received routine care or will receive routine care during the course of the day. The concept of ancillary care is that it is indeed ancillary to the primary, routine care. Here, too, it is simply assumed that all midnight ancillary patients make roughly equal use of routine services at roughly equal cost.

The Secretary contends that the hospitals have no cause for complaint because the labor/delivery area is treated the same as other ancillary areas. Thus in challenging the way labor/delivery patients are counted; the hospitals challenge the way patients in all ancillary services are counted. Appellee's Brief at 28–29. Moreover, to the extent that the hospitals' argument is based on the disparity between services received and costs counted, they are in effect challenging the use of averaging entirely. *Id.* at 40–41. Averaging is used precisely to avoid having to keep detailed records of the services actually received and costs incurred by each patient. The treatment of labor/delivery area patients is no more unreasonable, HHS argues, than the treatment of the patient admitted at 11:55 p.m. and released at 12:05 a.m. the next day. *See id.* at 37. Each has received little or no routine care, but each is counted as having received a full day of routine care. In the end, it all washes out.

Again we would have to agree with the Secretary if this were an accurate portrayal of the situation, but it is not. First, the patient who receives only ten minutes of routine care and is then released is counted in the routine population, but the costs of a day of routine care are also added to the calculation of the average per diem cost of routine services. The labor/delivery room patient is added to the inpatient count, but labor/delivery costs are not included in the calculation of the average per diem cost. Medicare reimbursement therefore is not

diluted on account of the ten-minute patient but is on account of the labor/delivery patient. Second, the routine patient has received at least *some* routine care before routine costs are apportioned to him as a routine inpatient. The labor/delivery room patient has received none before she is counted as an inpatient.

The labor/delivery area also appears to differ from the other ancillary care areas. First, the hospitals have demonstrated that the class of patients residing in the labor/delivery area at the census-taking hour have received no routine care, *see supra* note 6, and will not necessarily receive routine care, *supra* pp. 469–70. This is not a case of hypothetical examples at the extremes, therefore, and we need not guess as to whether extreme cases somehow are balancing one another out. We know for a fact that no routine care has been provided to these patients, but routine care costs are being attributed to them. Second, the hospitals have shown that up to forty percent of all labor/delivery patients will be there at the census-taking hour. *See* Rec. at 147–48 (Dr. Dale); *id.* at 185 (Mr. Kramer). Third, virtually no Medicare patients use labor/delivery services. *Id.* at 170 (Mr. Kramer).

The hospitals suggest that, in contrast, a much smaller percentage of the patients in other ancillary areas will be there at midnight, that at least some of them will have received routine care before coming to the ancillary area and will receive routine care thereafter, and that the proportion of Medicare patients using those services is likely to correspond more closely to the proportion of Medicare patients in the routine care population. Appellants' Brief at 50–52. The argument is largely based on inference. First, most other services can be and typically are scheduled for the daytime. Second, patients pass through the other ancillary services that might receive patients at night (e.g., x-ray, emergency, surgery) relatively more quickly than they pass through labor/delivery, Rec. at 146–47, 173, so that if a patient were admitted to one of those areas at night it is less likely that he would remain there at midnight. Third,

patients in the other ancillary areas at midnight will only be counted in the census if they already have been admitted to the hospital as routine inpatients, *see* Rec. at 173–74, with the expectation that they will remain and receive routine care. Fourth, midnight was chosen as the census hour because most patients would in fact be in their normal (i.e., either routine or special care unit) beds. Rec. at 189–90. Finally, we know why there is so little use of labor/delivery facilities by Medicare patients: elderly women cannot have children, and very few disabled women who qualify for Medicare can or will do so. We have no reason to believe that there is so categorical an exclusion of Medicare patients from other ancillary areas.

Assuming that these distinctions are valid, the hospitals' argument comes down to the following. The relatively small distortions in reimbursement that may result from counting the few patients in other ancillary areas as routine inpatients are not worthy of complaint. In contrast, the hospitals here claim over one million dollars in lost reimbursement for one year that results from counting labor/delivery area patients as routine inpatients. The hospitals also seem to assume that Medicare patients are proportionately represented in their use of other ancillary services, and therefore any dilution of the average per diem cost per patient is recouped by increasing the number of Medicare patients for whom routine costs are reimbursed. *See* Appellants' Brief at 52–53; *supra* note 8. *See also John Muir Memorial Hospital, Inc. v. Schweiker,* 559 F.Supp. 1042, 1046 (N.D.Cal.1983) (finding similar argument persuasive).

■ The Secretary argues that these distinctions are not proven and therefore cannot be relied upon to reverse the Deputy Administrator's decision. Appellee's Brief at 29–32. We disagree. First, the hospitals did demonstrate the existence of those aspects of the labor/delivery area that they claim are distinctive: the comparatively high number of patients residing there at midnight, the absence of routine care preceding the census, the lack of certainty that

routine care will follow the census, and negligible use of these services by Medicare beneficiaries. *See supra* pp. 471–72. HHS presented no evidence to demonstrate that these were not distinguishing characteristics. Once the hospitals presented evidence supporting a prima facie case of a violation of 42 U.S.C. § 1395x(v)(1)(A), it was up to the Secretary to present some evidence to rebut it. *Cf. Gosman v. United States,* 573 F.2d 31, 36–37, 215 Ct.Cl. 617 (1978) (intermediary need not rebut wholly implausible claim).

Second, if these aspects of labor/delivery care do not distinguish it from other ancillary care areas, it is not clear why that should make counting labor/delivery patients as inpatients any more proper. That is, if accounting for other ancillary area patients suffers from the same defects the hospitals have demonstrated with regard to the labor/delivery area patients, then perhaps the patients in those areas at midnight also should be excluded from the routine inpatient count. We return to this issue in the next part.

We are bolstered in our conclusion that the Secretary's need for averaging does not compel his result in this case by the fact that other cost elements are not included in the calculation of the average routine cost per diem. Specifically, neither bad debt nor malpractice insurance costs are averaged across the entire patient population but must be apportioned directly to their source as either Medicare or non-Medicare. *See* 42 C.F.R. §§ 405.420, 405.452(b)(1)(ii) (1982). Averaging was abandoned with regard to malpractice costs to avoid Medicare's bearing a disproportionate share of those costs. We see no reason to believe averaging should be any more sacrosanct here.

█ In sum, averaging is a tolerable method when there is at least some reason to believe that the premises for its use actually obtain. The hospitals have demonstrated that labor/delivery patients are an exception to the rule. Because they will not have received routine inpatient care before the midnight count and because they are not certain to receive such care during the remainder of the day, they should not be counted among the routine inpatient population at the midnight census.

### E. Accounting Consistency

The Secretary's final argument is that excepting labor/delivery area patients from the accounting treatment given patients in all other ancillary areas would invite administrative chaos. The argument is based on the structure of 42 C.F.R. § 405.452(d)(7) (1977), which makes a limited exception from the inpatient count for newborns and patients in special care units. Since the regulations state that the labor/maternity area is not a special care unit, *id.* § 405.-452(d)(10), the Secretary argues that patients in that area must be counted in the routine inpatient population. Otherwise the hospitals will be encouraged to concoct reasons to make exceptions for other ancillary areas or to allege mismatching of costs and patients elsewhere. *See* Appellee's Brief at 41.

The Secretary's more restrictive reading of section 452(d)(7) is plausible in the abstract, and we noted earlier that in the face of two equally plausible interpretations, the Secretary wins. *Supra* p. 468. Moreover, we recognize that the Secretary is entitled to a good deal of leeway in administering the Medicare reimbursement system; it is very difficult to apportion costs precisely and the Secretary should not be put to the test line-item by line-item. We do not mean to invite such picayune inquiries into the Secretary's practices in the future.

█ In the end, however, the Secretary must act rationally and within the constraints of the underlying law. We find on the record presented to us that he has not done so. It is irrational to apportion to labor/maternity patients costs which they have not incurred without either including the costs that they have incurred or demonstrating that the distortion is balanced by some other aspect of the accounting process. Because labor/delivery area costs are not included in the calculation of the average routine cost per diem and because there is no evidence that this imbalance is made up elsewhere, non-Medicare payors are forced to bear some of the costs of the

Medicare program. This is a concrete violation of the constraints placed on the Secretary's discretion in promulgating regulations under 42 U.S.C. § 1395x(v)(1)(A). Because reversing the Deputy Administrator's decision could have a substantial impact on the Medicare program, however, and because the Secretary was represented by the fiscal intermediaries and not directly before the PRRB, we remand this case for the limited purpose of the PRRB's taking evidence on the question whether the number of Medicare patients found nationally in other ancillary areas at the census hour is sufficient to offset the dilution of Medicare reimbursement created by counting labor/maternity patients in the routine inpatient count. If there is no such offset or if the Secretary decides not to contest the issue, then the Secretary may not count labor/delivery patients, who have not previously that day received routine care, among the routine inpatient population for purposes of calculating the average cost per diem for routine services.

## IV

One of the hospitals involved in the group appeal, St. Vincent Hospital and Medical Center of Toledo ("St. Vincent"), included labor/maternity area patients in its inpatient count when it timely filed its cost reports with its fiscal intermediary, Blue Cross of Northwestern Ohio ("BCNO"), pursuant to 42 C.F.R. §§ 405.453(f), 405.1801(b) (1977). After BCNO issued its Notice of Program Reimbursement containing its determination of the reimbursement due St. Vincent, see id. § 405.1803, St. Vincent requested that BCNO reopen its cost report to exclude labor/delivery area patients from the inpatient count. See Letter from Thomas B. Lang to Donald L. Reed (May 11, 1979), J.A. at 180. BCNO refused the request, citing 42 C.F.R. § 405.1885 and Intermediary Manual § 2631 (HIM–13). Letter from Donald L. Reed to Thomas B. Lang (May 16, 1979), Rec. at 277. BCNO later reopened St. Vincent's cost report to revise matters unrelated to the labor room issue, St. Vincent again requested that BCNO reopen the labor room issue, its request was again denied, and St. Vincent

then sought to join the group appeal to the PRRB. See Dep.Admin.Dec. at 3, 11, J.A. at 53, 61. Over the objection of the intermediary, the PRRB concluded that it had jurisdiction: "[S]ince the Provider's cost report was reopened, the Provider was entitled to make any claim for additional reimbursement at that time." PRRB Dec. at 2, J.A. at 75. The Deputy Administrator reversed. Dep.Admin.Dec. at 12, J.A. at 62. Because of its disposition on the merits, the District Court did not discuss the question of the PRRB's jurisdiction over St. Vincent's claim.

The issue of PRRB jurisdiction is pending before this court in a petition for rehearing in the case of Athens Community Hospital, Inc. v. Schweiker, 686 F.2d 989 (D.C.Cir. 1982), petition for rehearing filed, 686 F.2d 989 (D.C.Cir.1982). We withhold judgment regarding jurisdiction over St. Vincent's claims until Athens is disposed of finally.

## V

We reverse the District Court's affirmance of the Deputy Administrator's decision on the labor room issue. We withhold judgment regarding the claim that the PRRB was without jurisdiction to hear the claim of St. Vincent Hospital and Medical Center of Toledo. We remand the case to the District Court with instructions to remand to the PRRB for the limited purpose of taking evidence on the issue of whether the use of other ancillary services by Medicare beneficiaries at the census-taking hour suffices to compensate for the dilution of Medicare reimbursement caused by including labor/delivery area patients in the calculation of average general routine costs per diem. Absent substantial evidence to support such a contention, the Secretary is directed to exclude labor/delivery room patients, who have not previously that day received routine services, from the inpatient count used to derive the average cost per diem for general routine services.

*It is so ordered.*