**CARRAWAY METHODIST MEDICAL CENTER, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 82–C–2655–S.**

United States District Court, N.D. Alabama, S.D.

March 22, 1984.

**1338**

William D. Wise, Birmingham, Ala., Margaret M. Manning, Sanford V. Teplitzky, Deborah A. Randall, Ober, Grimes & Shriver, Baltimore, Md., for plaintiff.

Frank W. Donaldson, U.S. Atty., Herbert J. Lewis, III, Asst. U.S. Atty., Mary P. Thornton, Birmingham, Ala., for defendant.

## MEMORANDUM OF OPINION GRANTING SUMMARY JUDGMENT FOR PLAINTIFF

CLEMON, District Judge.

Two questions are presented for review by this action: (1) is the interpretation by the Secretary of the Department of Health and Human Services ("the Secretary") of 42 C.F.R. § 405(d)(10) a reasonable one, and (2) does substantial evidence support the determination by the Secretary that the intermediate care unit ("IMC") of plaintiff Carraway Methodist Medical Center ("Carraway") is not a "special care unit," within the meaning of the aforesaid regulation.

### The Regulatory Scheme

Carraway is a "provider of service" under the Medicare Act, pursuant to 42 U.S.C. § 1395cc. It is a short term, acute care, non-profit hospital located in Birmingham, Alabama. Under its contractual relationship with the Secretary, it is obligated to furnish hospital services to Medicare beneficiaries. It is entitled to receive reimbursements from the Secretary for the reasonable costs incurred in furnishing such services.

Provider reimbursement is generally effectuated through a fiscal "intermediary" selected by the provider and appointed to act as an agent for the Secretary in reviewing claims and administering payments. The final determinations of the intermediary are subject to a right of appeal to a Provider Reimbursement Review Board ("PRRB"). Decisions of the PRRB become final unless the Secretary reverses, affirms, or modifies them.

In accordance with her statutory authority, the Secretary has issued certain regulations which provide that all necessary and proper, direct and indirect, expenses of a hospital in the production of services are allowable as reasonable costs. Direct and indirect costs of rendering services to all patients are allocated to the various departments of a hospital. For the purpose of apportioning the costs of services rendered to Medicare patients, the departments of a hospital fall into one of two categories: (1) departments which render routine services, and (2) "special care units."

"Routine services" include room, dietary and nursing services, minor medical and surgical supplies and the use of equipment for which a separate charge is not customarily made. 42 C.F.R. 405.452(d)(2). Under the regulatory scheme, the apportionment of costs requires the computation of average per diem costs of routine services and an allocation of those costs between Medicare beneficiaries and other patients.

In 1972, special care units were first recognized in the apportionment scheme. The applicable regulation, which was in effect during the times material to this case, provides for the separate calculation of the average cost per diem for "intensive care units, coronary care units, and other special care inpatient hospital units ..." 42 C.F.R. 405.452(d)(8). The regulatory definition states:

To be considered an intensive care unit, coronary care unit, or other special care inpatient hospital unit, the unit must be in a hospital, must be one in which the care required is extraordinary and on a concentrated and continuous basis and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but excludes post-anesthesia recovery rooms, or maternity labor rooms.

The special care cost computations usually result in higher per diem rates for reimbursement purposes than the rates for routine care areas.

### The Facts

Virtually all of the facts are undisputed. The parties are in agreement that the Intermediate Care Unit at Carraway is in a hospital, is physically identifiable as separate from general patient care areas, and that Carraway has specific written policies for the unit. Thus, three of the four requirements of 42 C.F.R. 405.452(d)(10) are admittedly met. The issue is whether the unit is "one in which the care required is extraordinary and on a concentrated and continuous basis."

Carraway has designated four special care units: Intensive Care Unit (ICU), Intermediate Care Unit (IMCU), Coronary Care Unit (CCU), and the Neurosurgical Unit ("Neuro"). The ICU, CCU, and Neuro are accepted by the Secretary as special care units. Between 1972 and 1977, the IMCU was treated by the intermediary and by the Secretary as a special care unit.

The IMCU at Carraway was designed to provide care for critically ill patients who are not in need of the two invasive procedures available in ICU—respiratory support and hemodynamic monitoring. The IMCU, along with the ICU and CCU, is located on the third floor of the hospital.

Like the ICU and CCU, it is under the jurisdiction of the Critical Care Committee of Carraway; and it adheres to that committee's critical care policy and procedure manual.

The stated purpose of IMCU, according to the Hospital's procedures manual, is "to provide consistent and highly skilled nursing care to those patients who need frequent observation and specialized nursing care." According to the manual, only those patients who "require close observation on a concentrated basis" are eligible for admission to IMCU. The stated purpose of the ICU, on the other hand, is

> To provide maximum surveillance and support of vital functions and definitive therapy for medical-surgical patients with acute, but reversible, life-threatening impairment of single or multiple vital systems. To provide care to seriously ill patients who require extraordinary care on a concentrated continuous basis. To provide care for patients requiring close observation to avert life-threatening situations.

Critically ill patients who do not require respiratory support or hemodynamic monitoring are admitted directly to IMCU or transferred there from ICU or CCU. The record is manifestly clear that if the IMCU did not exist, patients who would otherwise be admitted or transferred to IMCU would remain in or be admitted to ICU, Neuro, or CCU; for they could not be treated on the routine floors.[1]

IMCU patients come from a variety of sources. Roughly half (49.3%) of them are direct admissions (i.e., from the emergency room, admissions office, etc.). Forty-two percent of its patients are transferred from ICU or CCU when they no longer require mechanical respiration or hemodynamic monitoring. Nearly eight percent of IMCU's patients are transferred from routine care areas.

The ICU, CCU and IMCU have electronic monitors. Because the patients in ICU and CCU are often immobilized by invasive

---

1. Presently, when the IMCU is fully occupied, patients who would otherwise be admitted to it are instead sent to ICU, Neuro, or CCU.

equipment, these units utilize "hard-wired" monitors. In the IMCU, telemetric monitors, which send signals directly to the monitoring computer, are used. Telemetric monitors are less restrictive than hard-wire monitors.

Registered nurses in the IMCU receive the same special critical care training as the ICU and CCU nurses.

The nurse/patient ratio (1:2) for the IMCU is roughly half that of the ICU and CCU, although IMCU patients frequently receive one-to-one nursing care. On the other hand, the patient/nurse ratio in the Neuro unit seems to be even lower than that of the IMCU.[2]

Extensive life-saving equipment is available in the IMCU.

The daily rates for the IMCU are lower than the rates for ICU, CCU and Neuro.[3] However, IMCU's rates are significantly higher than those of the routine areas of the hospital.

IMCU's costs per available day are substantially lower than those of ICU and CCU, but they seem to be higher than Neuro's costs per available day.

In ICU and CCU, all of the patients can be visually seen from the nurse's station—in contrast to the rooms of IMCU, which cannot be observed from the nurses' station. The record is silent on whether Neuro's patients are observable from the nurses' station.

In the words of the Intermediary's expert witness "[t]he IMCU is more like an ICU or a CCU. In other words, it is clearly above a routine." In his view, the IMCU at Carraway is "significantly above" its routine care areas.[4]

From 1972, when special care units were first recognized by the Secretary, until 1977 the IMCU at Carraway was treated and reimbursed as a special care unit.

### Course of Proceedings

Carraway duly filed its cost report for the fiscal year ending June 30, 1978. An audit was subsequently conducted by the Intermediary; and the Intermediary determined that the IMCU did not qualify as a special care unit. The intermediary reclassified the IMCU as a routine care area; and the ultimate result was a decrease in Carraway's 1978 Medicare reimbursement by $54,000.

Carraway appealed the decision of the Intermediary to the PRRB. The PRRB conducted a hearing; and, based on the hearing, it overturned the decision of the Intermediary and found that the IMCU at Carraway is a special care unit. The Chairman of PRRB dissented; and the Secretary, through her designee the Deputy Administrator of the Health Care Financing Administration, undertook *sua sponte* a review of the PRRB decision. The PRRB decision was reversed, based on the Secretary's narrow interpretation of 42 C.F.R. § 405.452(d)(10). Carraway timely filed this action thereafter.

### The Secretary's Interpretation of the Regulation

The Secretary's interpretation is summarized in her brief filed herein:

Only two levels of care recognized by Medicare regulations—special and routine—and in determining whether a purported special care unit meets the regulatory criteria, the Secretary has chosen to compare the care provided to the level of care traditionally given in the enumerated special care unit. In other words, if the care unit in question does not provide care at substantially the same level as

---

**2.** The Secretary has chosen not to compare the IMCU to the Neuro unit—an accepted special care unit at Carraway. K. 344–346.

**3.** Daily Rates

| | |
|---|---|
| Routine Areas | $98 – $117 |
| ICU | $170 |
| CCU | $190 |
| Neuro | $170 |
| IMCU | $140 – $150 |

**4.** Dr. Stigler, the Intermediary's expert, was nonetheless of the opinion that the overall level of care in the IMCU is not substantially the same as that in the ICU or CCU. For that reason, he felt that the IMCU is not a special care unit.

that rendered in traditional intensive care, coronary care, burn and pulmonary units, it cannot be classified as a special care unit within the meaning of 42 C.F.R. § 405.452(d)(10), even though it may provide care considerably greater than that found in post routine care facilities.

Admittedly, the Secretary's interpretation is a "very narrow" one.

### The Reasonableness *Vel Non* of the Secretary's Interpretation

■ If the Secretary's interpretation of her regulation is reasonable, consistent with the statute, and not arbitrary or capricious, it must be upheld. *Homan & Crimens, Inc. v. Harris*, 626 F.2d 1201 (5th Cir.1980).[5] The Ninth Circuit has upheld the Secretary's narrow interpretation of the regulation at issue. *White Memorial Medical Center v. Schweiker*, 640 F.2d 1126 (9th Cir.1981); *John Muir Memorial Hosp., Inc. v. Schweiker*, 664 F.2d 1337 (9th Cir.1982). The Seventh Circuit, on the other hand, has held that the Secretary's interpretation of the regulation is unreasonable. *Community Hospital of Indianapolis, Inc. v. Schweiker*, 717 F.2d 372 (7th Cir.1983). The Third Circuit has affirmed a district court decision which held that the Secretary's interpretation was unreasonable. *St. Luke's Hosp. of Bethlehem, Pa. v. Schweiker*, 688 F.2d 824 (3rd Cir.1982), affirming 688 F.2d 824 (E.D.Pa.1981). CCH Medicare and Medicaid Guide, paragraph 31,501. The Eleventh Circuit has not spoken to the issue.

The starting point in the effort to determine the meaning of § 405.452(d)(8) is the regulation itself. In order to qualify for "special care" status, a unit, among other things, "must be one in which the care required is extraordinary and on a concentrated and continuous basis...." The words of the regulation have plain mean-

ing. "Extraordinary" means more than ordinary, not of the ordinary order or pattern, going beyond what is usual, regular or customary. *Webster's Third New Internat'l Dictionary 807*. To "concentrate" is to bring or direct toward a common center or objective, to focus. *Id.* 469. That which is "continuous" extends without break or interruption in time. *Id.* 495. There is no ambiguity in the words used in the regulation itself.

The doctrine of *esjusdem generis* is therefore inapposite,[6] because in referring to "intensive care unit" and "coronary care unit", the regulation does not seek to define what constitutes a special unit. Rather, it outlines the four criteria for a special care unit in clear and unambiguous terms. Other than post-anesthesia recovery rooms and maternity labor rooms, *any* unit of a hospital which meets the four specified criteria is entitled to treatment as a special care unit, based on the plain meaning of the regulation. And the determination of special care status is to be made on the basis of the enumerated criteria, not by a comparison of the unit to other established special care units in the hospital.[7]

■ The Secretary's predecessor in office wrote the regulation here at issue. Had he intended that "special care units" be confined to only those units which furnish a level of care equivalent to that furnished in intensive care or coronary units, he could have said so. Having failed to do so, the Secretary may not now extend § 405.452(d)(8) beyond its plain meaning. Not without significance, the Secretary has, by subsequent regulations, made it manifestly clear that only intensive care type inpatient hospital units and coronary care units are now to be treated as special care units.[8]

---

5. Decisions of the former Fifth Circuit Court of Appeals which were rendered prior to October 1, 1981 are binding precedent in the new Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981).

6. See *Bowles v. Seminole Rock and Sand Co.*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

7. As noted earlier, when the regulation was adopted, there were no established special care units for purposes of Medicare reimbursement.

8. For example, 42 C.F.R. § 405.452(d)(12) refers to "Intensive care type inpatient hospital units." Subsection (d)(9)(i) distinguishes routine services from "intensive care units, coronary care

The Secretary's belated attempt to change, by administrative "interpretation," the plain meaning of the 1972 regulation is arbitrary, capricious, and unreasonable. The "interpretation" adds a fifth requirement to the four specifically listed in the regulation—namely, that the level of care in a special care unit must be substantially identical to that provided by a traditional intensive care unit. It emasculates the plain meaning of the regulation. It is inconsistent with the Secretary and the Intermediary's implicit interpretation of the regulation for the first five years of its existence.

■ There is no doubt of the Secretary's authority to require by regulation that special care units be substantially identical, in the level of care they provide, to traditional intensive care units. But she may not add new requirements to an existing regulation by simply "interpreting" the regulation.

In view of the foregoing discussion, the Court concludes that the Secretary's interpretation of § 405.452(d)(8) is unreasonable, arbitrary, and capricious. It cannot serve as the basis for denial of the IMCU's status as a "special care unit" within the meaning of that regulation.

#### The Evidence Supporting The Secretary's Decision

■ Since the parties have agreed that Carraway's IMCU meets three of the four "special care unit" requirements, the remaining issue is whether substantial evidence supports the Secretary's decision that the IMCU is not "one in which the care required is extraordinary and on a concentrated and continuous basis." Based on the facts as found by the Secretary, the evidence which supports her decision is scarcely a scintilla.

The Secretary's decision rests principally on her interpretation of the regulation. This Court has concluded that her interpretation defies the plain meaning of the regulation and is therefore unreasonable. In her main brief filed in this case, the Secretary does not argue that the care provided by IMCU is routine. Rather, she argues that "[t]he level of care furnished by the IMCU was not equivalent to the level of care provided by the ICU or CCU." Defendant's Memorandum of Law, pp. 24–28. That argument, which assumes the reasonableness of the Secretary's interpretation of the regulation, misses the point. The inquiry is whether substantial evidence supports the finding that Carraway's IMCU does not provide extraordinary care on a concentrated and continuous basis. The Court's review of the entire record leads it to the conclusion that the finding is not supported by substantial evidence.

For the reasons stated herein, the decision of the Secretary shall be, by separate order, reversed and the cause remanded to the Secretary for further proceedings consistent with this opinion.

---

units", *and other intensive care type inpatient hospital units ....* " (emphasis added).