**CARRAWAY METHODIST MEDICAL CENTER, Plaintiff-Appellee,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant-Appellant.**

**No. 84–7338.**

United States Court of Appeals, Eleventh Circuit.

Feb. 22, 1985.

Frank W. Donaldson, U.S. Atty., Herbert J. Lewis, III, Asst. U.S. Atty., Birmingham, Ala., Dana Joseph Petti, Asst. Regional Atty., Atlanta, Ga., for defendant-appellant.

Margaret M. Manning, Ober, Grimes & Shriver, Sanford V. Teplitzky, Deborah A. Randall, Baltimore, Md., for plaintiff-appellee.

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This action challenges the rate of reimbursement determined by the Secretary, pursuant to 42 C.F.R. § 405.452(d)(10), for an intermediate care unit (IMCU) located in Carraway Methodist Medical Center. The district court, 582 F.Supp. 1337 (N.D.Ala. 1984), reversed the decision of the Secretary that the IMCU did not qualify as a special care unit, finding that the Secretary's interpretation of 42 C.F.R. § 405.-452(d)(10) was unreasonable. Because we believe that the district court substituted its own judgment in a matter over which authority has been delegated by Congress to the Secretary, and erroneously rejected an interpretation which has been approved by several other courts, we reverse.

## I. THE FACTS

### A. The Regulatory Framework

Under the Medicare Act, 42 U.S.C.A. § 1395 et seq., hospitals which qualify as "providers" of medical services are obligated to furnish hospital care to Medicare beneficiaries. These "providers" are then entitled to receive reimbursements from the Secretary for the reasonable costs incurred in the provision of services. Provider reimbursement is administered by a fiscal "intermediary" selected by the provider and appointed to act as an agent for the Secretary in reviewing claims and overseeing payments. The final determinations of the intermediary are subject to appeal to a Provider Reimbursement Review Board (PRRB). Decisions of the PRRB become final unless the Secretary reverses, affirms or modifies them.

In making reimbursement determinations under the Act, the costs of routine services for all patient care areas of a hospital are considered together, an average per diem cost for the center is determined, the Medicare utilization rate is determined and Medicare pays its share of the routine service cost, as required by 42 U.S.C.A. § 1395x(v)(1)(A)(i). In 1972, the Secretary modified the apportionment regulations to separate from general routine

service costs the costs associated with intensive care, coronary care and other special care units. It was recognized that these units were used for treatment of patients only at the extreme of the continuum of care, and that, given the historically high costs of providing care in such units, it would be more equitable to determine the average costs and the Medicare share for those units alone. Separate apportionment was made available only for intensive care, coronary care and other units which qualified as special care inpatient units as defined in 42 C.F.R. § 405.-452(d)(10):

> To be considered an intensive care unit, coronary care unit, or other special care inpatient hospital unit, the unit must be in a hospital, must be one in which the care required is extraordinary and on a concentrated and continuous basis and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but exclude post-anaesthesia recovery rooms, or maternity labor rooms.

### B. Carraway Methodist Medical Center

Carraway Methodist Medical Center is a health care "provider" according to the specifications of the Medicare Act. In addition to the routine care provided on its general floors, the hospital maintains four special care units: Intensive Care Unit (ICU), Coronary Care Unit (CCU), Neurosurgical Unit ("Neuro") and Intermediate Care Unit (IMCU). The ICU, CCU and Neuro are accepted by the Secretary as special care units. Between 1972 and 1977, the IMCU was treated by the intermediary and the Secretary as a special care unit.

The IMCU, which is the subject of the instant litigation, was designed to provide care for patients who require more attention than is available on the general floors, but who are not in need of the intensive surveillance which is provided in the ICU

and CCU. It is under the jurisdiction of Carraway's Critical Care Committee, and adheres to the policies articulated in the Committee's Critical Care Policy and Procedure Manual. Patients are admitted to the IMCU from a variety of sources: other hospitals, physicians offices, emergency rooms, routine floors. Approximately 42% of the patients in the IMCU, however, are transferred from Carraway's ICU and CCU, after it is determined that they no longer require the intensive care provided in those units. The IMCU is located in a physically distinct area on the third floor of the hospital. It consists of 32 beds placed in 18 rooms forming a T-like configuration. Unlike the ICU or CCU, not all of the beds are visible from the nursing station. While the IMCU contains several types of lifesaving equipment not available on the routine care floors, including telemetric monitoring, it does not have intra-arterial pressure monitors, artificial respirators or hardwire heart monitoring units, which are available in the ICU and CCU. It has a sufficient supply of EKG monitors to permit the monitoring of every other patient in the ward, as compared with the monitor for every patient available in the ICU and CCU. Nurses in the IMCU are given critical care training and are available to patients at a ratio of 1:3 or 1:4, as compared with 1:2 in the ICU and CCU and 1:10 on the routine floors. Total nursing care hours per patient day averaged 12.22 for the IMCU and 23.88 for the ICU and CCU. Cost per room per day ran approximately $140–150 for the IMCU, as compared with $170–190 for the other special care units and $98–117 for the routine care areas. Television, telephones and liberal visiting hours, which are not available to patients in the ICU and CCU, are available in the IMCU.

### C. Course of Proceedings

When Carraway filed its cost report for the fiscal year ending June 30, 1978, an audit was conducted by the hospital's intermediary, who subsequently determined that the IMCU did not qualify as a special care unit. This conclusion had the effect of decreasing Carraway's 1978 Medicare reim-

bursement by $54,000. Carraway appealed the decision of the intermediary to the PRRB. That group conducted a hearing and subsequently overturned the decision of the intermediary, concluding that the IMCU qualified as a special care unit. The Chairman of the PRRB dissented; and the Secretary, through the Deputy Administrator of the Health Care Financing Administration, undertook *sua sponte* review of the PRRB decision. The Secretary reversed the decision of the PRRB, stating that 42 C.F.R. § 405.452(d)(10) required that the level of care provided by any "special care unit" be substantially the same as the level of care provided in the enumerated special care units in the same hospital. Carraway then filed an action in the United States District Court for the Northern District of Alabama; the district court reversed the decision of the Secretary, finding that her interpretation of 42 C.F.R. § 405.452(d)(10) was unreasonable and imposed an additional requirement not implied by the language of the regulation.

## II. INTERMEDIATE CARE UNITS AND 42 C.F.R. § 405.452(d)(10)

■ Judicial review of the Secretary's actions is governed by 42 U.S.C.A. § 1395oo(f), which provides that Section 706 of the Administrative Procedure Act, 5 U.S.C.A. § 706, controls the standard of review. Neither a district court nor an appellate court may overturn the Secretary's decision unless it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence in the record taken as a whole. *Sun Towers, Inc. v. Schweiker,* 694 F.2d 1036 (5th Cir.1983). *See also Boyd v. Heckler,* 704 F.2d 1207 (11th Cir.1983); *Bloodsworth v. Heckler,* 703 F.2d 1233 (11th Cir.1983). The Secretary's interpretation of a regulation she has been authorized to promulgate must be upheld unless it is unreasonable, arbitrary and capricious or inconsistent with the statute. *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201 (5th Cir.1980).

The IMCU clearly conforms to all of the requirements of 42 C.F.R. § 405.452(d)(10) but one: it is not clear that the care provided is "extraordinary and on a concentrated and continuous basis." Since 1977, the Secretary has taken the position that conformity to this last criterion should be determined by comparing the facility in question to facilities within the categories enumerated in the regulation (intensive care, coronary care, burn and pulmonary units) in the same hospital. If the facility in question "does not provide care at substantially the same level" as that provided by the enumerated units, it cannot be classified as a special care unit within the meaning of 42 C.F.R. § 405.452(d)(10), though it may provide care considerably greater than that found in routine care facilities. The district court found this interpretation to be unreasonable in that it added an additional requirement which was not implicit in the statutory language, and which was not required by any ambiguity in that language.

■ Although the reasonableness of the Secretary's interpretation appears to be a question of first impression in this Circuit, it has been considered on numerous occasions by both district and appellate courts in other circuits. A few courts have concluded that the Secretary's interpretation is unreasonable and that "extraordinary ... concentrated and continuous" care may be determined by comparing the unit in question with those providing routine care. *See Community Hospital of Indianapolis v. Schweiker,* 717 F.2d 372 (7th Cir.1983); *St. Luke's Hospital of Bethlehem v. Harris,* 688 F.2d 824 (3rd Cir.1982); *Rolling Hill Hospital v. PRRB,* CCH Medicare & Medicaid Guide 28,745 (E.D.Pa. Nov. 10, 1977). But the vast majority of courts which have considered the question have upheld the Secretary's interpretation as reasonable. *See NKC, Inc. v. Secretary,* 747 F.2d 1100 (6th Cir.1984); *St. Elizabeth's Hospital of Boston v. Secretary,* 746 F.2d 918 (1st Cir. 1984); *Lexington County Hospital v. Schweiker,* 740 F.2d 287 (4th Cir.1984); *Villa View Community Hospital v. Heckler,* 728 F.2d 539 (D.C.Cir.1984); *Sun Tow-*

*ers, Inc. v. Schweiker,* 694 F.2d 1036 (5th Cir.1983); *John Muir Memorial Hospital v. Schweiker,* 664 F.2d 1337 (9th Cir.1981); *White Memorial Medical Center v. Schweiker,* 640 F.2d 1126 (9th Cir.1981).[1]

The district court's criticism of the Secretary's interpretation also lacks merit. The conflict among the circuits initially sparked by the Secretary's interpretation of the provision suggests that the terms "extraordinary ... concentrated and continuous" are not so free of ambiguity as to render the Secretary's interpretive approach inapposite. Moreover, even if the language of the regulation was sufficiently clear when applied to the kind of two-tiered system of medical care originally envisioned by the provision, it became ambiguous as it was applied to the intermediate units and three-tiered systems of care that have arisen increasingly over the last ten years. It was incumbent upon the Secretary to explain the application of the regulation to such systems. While other interpretations might have been possible, the Secretary's approach is not unreasonable. By rejecting the Secretary's interpretation, the district court substituted its judgment on a matter which was plainly within the Secretary's delegated authority.

 Once the Secretary's interpretation of 42 C.F.R. § 405.452(d)(10) is accepted, it is clear that her decision is supported by substantial evidence. The lifesaving and monitoring systems available in the IMCU are far less extensive than those in the ICU and CCU; the nursing hours and nurse-patient ratio are half of what they are in the enumerated units; the cost per room is lower; and amenities such as telephones and television, which are not permitted in the ICU and CCU, are available. Perhaps most importantly, 42% of the patients in the IMCU have been transferred there from the ICU or CCU, and the policy and procedures manual for the hospital suggests that the IMCU is a "step-down" ward for patients who no longer need the kind of care provided in the ICU or CCU ("When a patient no longer requires monitoring and/or comprehensive observation, he shall be transferred to the general floor of the IMC ..."). Similar combinations of factors have been found to offer substantial support for decisions of the Secretary denying "special care unit" status in other cases. *See, e.g., Metropolitan Hospital v. PRRB, supra; Sun Towers v. Schweiker, supra; Villa View Community Hospital v. Heckler, supra.* Though the level of care provided in the IMCU may be substantially higher than that provided in the routine care areas, this is not relevant according to the Secretary's interpretation; because substantial evidence supports the conclusion that the level of care offered in the IMCU was lower than that offered in the ICU and CCU, the decision of the Secretary will be upheld.

The judgment of the district court is REVERSED and VACATED, and the case is REMANDED with instructions to enter judgment for the Secretary.

**1.** Even the Third Circuit appears to have moderated its earlier position on the reasonableness of the Secretary's interpretation. In *Metropolitan Hospital v. PRRB,* 735 F.2d 1350 (3rd Cir.1984), the Court of Appeals affirmed a decision by the District Court for the Eastern District of Pennsylvania, which found the comparison of the special care unit in question with the enumerated units in the same hospital to be an "acceptable" approach under the regulation. While the district court took great care to present its opinion as consistent with *St. Luke's,* it clearly embraced what is most frequently considered to be the Secretary's interpretation of the regulation, regardless of how it chose to characterize the interpretation that was advanced in *St. Luke's.*