CHARTER PEACHFORD HOSPITAL, INC., A Georgia Corporation, Plaintiff-Appellant,

v.

Otis BOWEN, Secretary of Health and Human Services, and Carolyne K. Davis, Administrator of Health Care Financing, Defendants-Appellees.

No. 86–8008.

United States Court of Appeals, Eleventh Circuit.

Nov. 12, 1986.

Richard L. Shackelford, Atlanta, Ga., for plaintiff-appellant.

Nina L. Hunt, Asst. U.S. Atty., Edgar M. Swindell, Asst. Reg. Atty., Atlanta, Ga., for defendants-appellees.

Before GODBOLD and HILL, Circuit Judges, and LYNNE *, Senior District Judge.

HILL, Circuit Judge.

The Medicare program is primarily intended to provide benefits for individuals of relatively advanced age. In this case, however, we reach what would appear to be the unlikely conclusion that a provider of services may recover from the Medicare program a portion of the costs of educational services for children. This holding merits some explanation.

* Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

## I. FACTS

Charter Peachford Hospital, Inc. ("Charter Peachford"), is a psychiatric hospital which is certified to be a "provider" of services under the Medicare Program. Further, it provides its services to the general community. As part of its treatment plan, Charter Peachford provides an educational program for patients who are eighteen years old or younger. Charter Peachford employs teacher-therapists to teach academic subjects and, as to members of the hospital's multi-disciplinary treatment team, provide various direct therapeutic services to its minor patients.

Charter Peachford sought reimbursement under the Medicare Act, 42 U.S.C. § 1395 *et seq.* (1982 and Supp. II 1984), for part of the teacher-therapists' salaries for the 1980 fiscal year.[1] The "fiscal intermediary," authorized by the Secretary of Health and Human Services (the "Secretary") to make such reimbursement pursuant to 42 U.S.C. § 1395h (1982 and Supp. II 1984), denied reimbursement for any part of the educational costs. Although Charter Peachford did not originally claim reimbursement for the salaries in its 1980 cost report, it later appealed the intermediary's disallowance of these costs to the Provider Reimbursement Review Board ("PRRB"). After conducting an evidentiary hearing, the PRRB affirmed the decision of the fiscal intermediary, holding that educational costs were specifically disallowed by section 2104.5 of the Provider Reimbursement Manual (HIM–15). Alternatively, the PRRB held that even if the educational costs were allowable, they were "ancillary costs" rather than "routine costs." Because no Medicare beneficiaries received services under the educational program, none of the costs could be reimbursed. The Deputy Administrator of the Health Care Financing Administration, acting on behalf of the Secretary, affirmed the PRRB's decision on both grounds.

Charter Peachford subsequently brought this action in district court contending that the Secretary's decision should be reversed because it was not supported by substantial evidence. The case was referred to a magistrate who recommended that the Secretary's decision be affirmed in part, reversed in part and remanded for calculation of the percent of salary costs attributable to therapeutic activities. The magistrate's recommendation was based on three findings: (1) the cost of Charter Peachford's purely educational program was not eligible for reimbursement because the program could not be used by Medicare beneficiaries; (2) the Secretary's conclusion that the teacher-therapists' time was spent entirely on education-related activities was not supported by substantial evidence and, in fact, the evidence showed that approximately 70 percent of their time was spent in therapy-related activities; and (3) the Secretary's conclusion that the cost of any time attributable to therapy would be ancillary was not supported by substantial evidence. The district court rejected the magistrate's recommendation and affirmed the Secretary's decision, holding that the Secretary's decision was supported by substantial evidence.

## II. STANDARD OF REVIEW

■ Judicial review of a decision of the Deputy Administrator is governed by 42 U.S.C. § 1395oo(f) (1982 and Supp. II 1984) which incorporates the standards of Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706 (1982). *Carraway Methodist Medical Center v. Heckler,* 753 F.2d 1006, 1009 (11th Cir.1985). An agency's decision must not be overturned unless it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence in the record taken as a whole. *Id.*

■ In exercising its review of legal questions, the court is required to accord substantial deference to the interpretation

---

1. Charter Peachford claimed these costs as allowable costs for routine services. Of the $157,976 total cost for these services for the 1980 fiscal year, Medicare's share would be approximately $3,100.

of an agency charged with the administration of a statute. *See, e.g., Connecticut Department of Income Maintenance v. Heckler,* 471 U.S. 524, 105 S.Ct. 2210, 2215, 85 L.Ed.2d 577 (1985). An agency's interpretation of a regulation it has been authorized to promulgate is also entitled to great deference and must be upheld unless it is unreasonable, arbitrary and capricious or inconsistent with the statute. *Carraway Methodist Medical Center,* 753 F.2d at 1009.

### III. THE MEDICARE REIMBURSEMENT PROGRAM

This appeal involves Part A of the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* Part A provides hospital insurance benefits for services rendered by a "provider of services," as defined in 42 U.S.C. § 1395x(u) (Supp. II 1984), including hospitals. Providers are entitled to be reimbursed for the reasonable cost of furnishing covered services to Medicare patients or, if lower, the customary charges for such services. 42 U.S.C. § 1395f(b) (1982 and Supp. II 1984).[2] The statute defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services" as determined under the Secretary's regulations. 42 U.S.C. § 1395x(v)(1)(A) (Supp. II 1984). The Secretary is directed to establish methods for determining reasonable cost that will account for both direct and indirect costs and prevent cross-subsidization—that is, not shift the cost of furnishing care to Medicare beneficiaries onto other patients or vice versa. *Id.*

Under the Secretary's regulations, Medicare reimbursement involves a two-step determination of: (1) the provider's "allowable costs" for supplying services and (2) the proportion of those costs that is to be borne by Medicare. 42 C.F.R. § 405.403(a) (1985). Separate principles, set out in the regulations, govern each of the two steps. *Id.*

In determining the total amount of a provider's "allowable costs," the regulations recognize "[a]ll necessary and proper expenses of an institution in the production of services," 42 C.F.R. § 405.402(a) (1985), subject to specific limitations. 42 C.F.R. § 405.451(a) (1985). "Necessary and proper costs are costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 405.451(b)(2) (1985). The following types of costs are deemed unallowable: "amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provision of luxury items or services...." 42 C.F.R. § 405.451(c)(3) (1985). The regulations repeat the statutory admonition that any determination of the reasonable cost of services must be based on costs related to the care of Medicare beneficiaries, 42 C.F.R. § 405.451(c)(3) (1985) and that costs should not be shifted between Medicare and non-Medicare patients. 42 C.F.R. § 405.402(a) (1985). Nonetheless, the definition of *allowable* costs, the first step toward determining *reasonable* cost, is not limited to services related to Medicare patient care. In effect, the determination of allowable costs results in a large pool of costs related to patient care. The second step of the formula, apportionment, then narrows that amount to approximate the cost of supplying services to Medicare beneficiaries.

The share of total allowable costs to be borne by the Medicare program is "determined in accordance with principles relat-

---

**2.** The cost reimbursement mechanism and procedures described above were in effect during the period at issue in this litigation. Effective October 1, 1983, Congress provided for phase-in of a new prospective payment system. 42 U.S.C. § 1395ww *et seq.* (Supp. II 1984). Psychi-

atric hospitals, such as Charter Peachford, are excluded from the prospective payment system and continue to be reimbursed on the basis of reasonable costs. 42 U.S.C. § 1395ww(d)(1)(B)(i).

ing to apportionment of cost." 42 C.F.R. § 405.403(a) (1985). In furtherance of the statutory mandate against cross-subsidization, the regulations endeavor to use methods of apportioning costs that "to the extent reasonably possible, result in the program's share of a provider's total allowable costs being the same as the program's share of the provider's total services." 42 C.F.R. § 405.403(b) (1985).

In this case, the "departmental method" was used to apportion allowable costs. The departmental method requires two separate calculations depending upon whether the particular allowable costs are characterized as "routine services" or "ancillary services." 42 C.F.R. § 405.452(a)(1)(i) (1985). "Routine services" are the "regular room, dietary, and nursing services, minor medical and surgical supplies, and the use of equipment and facilities for which a separate charge is not customarily made." 42 C.F.R. § 405.452(b) (1985). "Ancillary services" are "services for which charges are customarily made in addition to routine services." *Id.*

The amount of reimbursement for routine services is calculated by multiplying the average cost of a day of general routine care (the "average per diem" cost) by the number of Medicare beneficiary inpatient days. 42 C.F.R. § 405.452(a)(1)(i), (b), (e)(1) (1985).[3] The average per diem cost is determined by dividing the total inpatient general routine service costs (net of the private room cost differential) by the total number of inpatient general routine days. 42 C.F.R. § 405.452(b) (1985). This method may be summarized as follows:

$$\frac{\text{Total Routine Service Costs}}{\text{Total Inpatient Days}} = \text{Average Per Diem Cost}$$

$$\frac{\text{Average Per Diem Cost} \times \text{Medicare Inpatient Days}}{} = \text{Provider Reimbursement}$$

This procedure thus employs an averaging principle which distributes routine costs without regard to whether a particular routine cost is associated with a Medicare beneficiary or whether the Medicare benefi-

ciary's use of routine services is above or below average.

The calculation of a routine average cost per diem assumes that all patients receive roughly the same services per day at roughly the same cost per patient. Everyone knows that this is not true in individual cases, but for reasons of administrative simplicity it is assumed that the extreme divergences from the mean balance out.

*Saint Mary of Nazareth Hospital Center v. Schweiker*, 718 F.2d 459, 471 (D.C.Cir. 1983).

The costs for ancillary services, on the other hand, are apportioned between Medicare and non-Medicare patients based on the percentage of the total charges for a particular ancillary department that is attributable to usage by Medicare beneficiaries. 42 C.F.R. § 405.452(a)(1)(i), (b), (e)(1) (1985). This formula may be summarized as follows:

$$\frac{\text{Beneficiary Charges}}{\text{Total Patient Charges}} \times \frac{\text{Department}}{\text{Cost}} = \frac{\text{Provider}}{\text{Reimbursement}}$$

This formula assumes a correlation between charges and costs and determines the Medicare share based on actual, rather than average, usage of a particular service.

## IV. CHARTER PEACHFORD'S EDUCATIONAL PROGRAM

Using the departmental method, outlined above, Charter Peachford is entitled to a percentage of the costs of its educational program if they are allowable costs for routine services.

### A. *Teacher-Therapist Salaries as Allowable Costs*

Costs are "allowable" under the Secretary's regulations, if they are necessary and proper for patient care as well as common and accepted occurrences in the provider's field. Charter Peachford presented uncontradicted evidence that the school program is an essential and integral part of its treatment plan for children and adolescents. In particular, Charter Peach-

---

**3.** A separate calculation is made for intensive care type hospital units. 42 C.F.R. 405.-

452(a)(1)(i) (1985).

ford's expert witnesses testified that school programs are necessary for psychiatric hospitals to provide adequate clinical care for their young patients and that the teachers are actively involved in the therapeutic treatment of the patients' psychological and emotional problems.

The expert and lay witnesses described the educational program's importance as a framework for therapy and some of the differences between Charter Peachford's program and other schools: For example, the teacher-therapists are housed in the unit with the children, class work is secondary to therapeutic progress and a student's time in Charter Peachford's program is not necessarily credited as full-time public school attendance. Moreover, Dr. Palomki testified that educational programs, such as Charter Peachford's, are required for accreditation by the Joint Commission on Accreditation of Hospitals ("JCAH"), and that the Medicare program requires psychiatric hospital providers to be JCAH accredited. *See* 42 C.F.R. § 405.1036 (1985).

■ The Secretary did not present any evidence to the contrary and, it seems, implicitly concedes that Charter Peachford's educational program is related to patient care. Instead, the Secretary claims these costs are not allowable because they are not related to the care of Medicare program beneficiaries. The Secretary argues that his position is supported by the principle against cross-subsidization. Specifically, the Secretary claims these costs are excluded by 42 C.F.R. § 405.451(c)(3) (1985) which states that "where the provider's operating costs include amounts ... specifically not reimbursable under the program ... such amounts are not allowable costs." Because the statute prohibits cross-subsidization, the Secretary argues that costs for

services which are not applicable to program beneficiaries are specifically not reimbursable under the Medicare program. The quoted restriction, however, is also contained in sections concerning services provided to Medicare beneficiaries. *See, e.g.,* 42 C.F.R. § 405.440(d)(2) (1985). Therefore, the Secretary's interpretation of this language is not consistent with its use in the regulations. More significantly, the Medicare regulations contain a list of specific exclusions. 42 C.F.R. §§ 405.308, 405.311–315 (1985). None of the listed exclusions applies to Charter Peachford's educational program. Thus, the regulations do not specifically exclude these services from allowable costs.

The Secretary primarily relies on section 2104.5 of the Provider Reimbursement Manual (HIM–15) which was also the basis for the PRRB decision. Section 2104.5 provides that: "The costs attributable to vocational, scholastic, or similarly oriented training activities conducted by providers on behalf of patients are not allowable costs. For example, costs incurred by a psychiatric facility in operating an elementary or secondary school for patients are unallowable costs." The Secretary claims that section 2104.5, which disallows costs related to patient care, is a valid interpretation of the statutory and regulatory prohibition against cross-subsidization.[4]

■ The Provider Reimbursement Manual is a compilation of interpretive rules which have not been promulgated as regulations pursuant to the Administrative Procedure Act. As such, it is not controlling. *See, e.g., Daughters of Miriam Center for the Aged v. Mathews,* 590 F.2d 1250, 1258 (3d Cir.1978). An agency's interpretation of its own regulations is entitled to defer-

---

**4.** In a similar case, the Secretary used Manual section 2104.5 to support the claim that the educational services at issue were not a necessary part of therapy. In response, the Ninth Circuit stated:

As the Secretary concedes, the manual provision is not evidence. Moreover, we see no reason why we should accept her opinion, as expressed in the manual provision, rather than that of the medical expert. Defining

what is necessary medical treatment does not appear to be one of those areas in which the Secretary has sufficient expertise that we should give unbridled deference to her interpretation.

*Vista Hill Foundation, Inc. v. Heckler,* 767 F.2d 556, 560 (9th Cir.1985). Having been unsuccessful with that claim, the Secretary now argues that this section interprets prohibition against the regulatory cross-subsidization.

ence, but the interpretation must comply with the regulations the agency has promulgated. *See e.g., North Georgia Building and Construction Trades Council v. Goldschmidt,* 621 F.2d 697, 710 (5th Cir. 1980). Thus, if Manual section 2104.5 is inconsistent with the regulatory method for calculating reasonable cost, the Secretary's interpretation must be rejected.

Despite the Secretary's reliance on the principle against cross-subsidization, the Medicare regulations do not confine allowable costs to those services applicable to Medicare beneficiaries. Likewise, the regulations do not permit "direct costing" of services that are used exclusively by Medicare beneficiaries. *See e.g., Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812 (D.C.Cir.1981) (Gerontological Treatment Center Classified as routine care area). As the Ninth Circuit noted in response to the Secretary's Medicare usage argument in a similar case:

> For the exclusion of these services from "routine costs" to be consistent with the Medicare Act's prohibition on cost-shifting between Medicare and non-Medicare patients, 42 U.S.C. § 1395x(v)(1)(A) (1982), the costs of analogous services used primarily by Medicare patients and infrequently, if at all, by the hospitalized children would also have to be excluded, and allocated on a usage basis. During the time that the children received educational services, elderly patients may be involved in attendant-supervised occupational or recreational therapy, including playing checkers or chess, sewing, weaving, or attending movies. Medicare Health Insurance Manual No. 10 § 210.-9(D) (Rev. 260 July 1981 & Rev. 310 Aug. 1982) expressly provides reimbursement for these activities, and their costs are reimbursed as "routine costs." The Secretary does not agree that these occupational or recreational therapy services—or any other services used heavily by Medicare patient—should be apportioned on a usage basis. Accordingly, the Secretary's argument constitutes an attempt to rely on her regulations and apportionment system when they reduce her reim-

bursement liability, and to ignore the procedures mandated by her apportionment system when they increase her reimbursement liability.

*Vista Hill Foundation, Inc. v. Heckler,* 767 F.2d 556, 565 (9th Cir.1985).

Although it appears inappropriate for Medicare funds to be used to pay for a part of classroom education for Charter Peachford's juvenile patients, the determination of allowable costs is for all practical purposes, unrelated to the specific services actually provided to Medicare patients. Rather than identifying the specific treatment and services provided to program beneficiaries and basing reimbursement on the costs associated therewith, the Secretary chose to calculate reasonable cost by presuming an average use of the entire "pot" of routine services. The Secretary willingly admits that, in a typical hospital situation, pediatric services are poured into the pot along with all other routine services to determine the average per diem cost. Conversely, it is understood that a hospital may provide a number of routine services that could not be expected to be used by children. In other words, when the pot is filled, it may contain, in addition to services used by all ages, the costs of some services provided only to older patients and some services provided only to juveniles. The averaging technique is meant to work out fairly for the individual providers. 42 C.F.R. § 405.402(b)(3) (1985). Individual exclusion of the cost of services not used by Medicare beneficiaries but inclusion of services used only by Medicare beneficiaries, would destroy the balance upon which the regulatory averaging principle depends and result in cross-subsidization to the provider's detriment.

The Secretary established the apportionment system and is free to designate another method of calculating costs if the current system appears to shift costs disproportionately to or from the Medicare program. For the present, we hold that Charter Peachford's teacher-therapists' salaries are allowable costs.

## B. *Routine or Ancillary Costs*

Alternatively, the Secretary claims that even if some of the teachers' time was spent in therapeutic activities, this cost should be treated as ancillary because of the educational program's "unique nature" and lack of Medicare utilization. Since ancillary costs are apportioned on the basis of actual Medicare utilization, not the averaging technique, none of the cost of Charter Peachford's educational program would be reimbursable.

 Medicare utilization is not the proper test: without elaborating, the PRRB found that the "school program services did not meet the definition of routine services in 42 C.F.R. § 405.452(d)(2) [sic]." Costs are ancillary if they are billed separately from routine services. 42 C.F.R. § 405.452(b) (1985). The Secretary argues that he is not limited to that definition, but may consider other factors to prevent "an inequitable apportionment of costs to the program." Provider Reimbursement Manual (HIM–15) § 2203. In addition, the Secretary claims that Provider Reimbursement Manual (HIM–15) § 2202.8 classifies all therapy services as ancillary, not merely those that are specifically enumerated. Section 2203, however, states that

> "[a] separate ancillary charge for a particular item or service other than those listed as ancillary in § 2202.8 is not recognized," and the cost of the item or service is not included in an ancillary cost center, where the common or established practice of providers of the same class (hospital or SNF) in the same state is to include the item or service in the routine service charge.

The Milieu therapy services in Charter Peachford's educational program are not listed in section 2202.8. The evidence shows that Charter Peachford and other hospitals do not customarily make a separate charge for educational services. Thus, under the Secretary's own regulations, the cost of the teacher-therapists' salaries is routine rather than ancillary.

We do not agree that, under the evidence in this case, costs will be inequitably apportioned to the Medicare program if the costs in this case are considered routine rather than ancillary. Patients, both young and old, are admitted to Charter Peachford for treatment of mental or emotional disturbances. Younger patients may receive much of their therapy in an educational setting while older patients receive therapy in other settings. Thus, treating the teacher-therapists' salaries as routine costs will not result in an inequitable apportionment of these costs to the Medicare program.

The decision of the district court is

REVERSED and REMANDED.