797 F.2d 449
 14 Soc.Sec.Rep.Ser. 339, Medicare&Medicaid Gu 35,531
ST. ELIZABETH HOSPITAL, INC., a Wisconsin non-profit
corporation, Plaintiff- Appellee, Cross-Appellant,
v.
Otis R. BOWEN, Secretary of the Department of Health and
Human Services, Defendant-Appellant, Cross-Appellee.
 Nos. 85-1531, 85-1697.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 11, 1986.
Decided July 28, 1986.
 
 Algenon Marbley, Asst. Regional Atty., Chicago, Ill., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for defendant-appellant, cross-appellee.
 Robert A. Wilmot, Purtell, Purcell, Wilmot & Burroughs, Milwaukee, Wis., for plaintiff-appellee, cross-appellant.
 Before CUDAHY and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 CUDAHY, Circuit Judge.
 
 
 1
 These two appeals involve regulations governing the reimbursement of hospitals for the cost of providing health care to Medicare beneficiaries. The Secretary of Health and Human Services (the "Secretary") appeals the district court's reversal of his determination that the "concentrated care unit" at St. Elizabeth Hospital ("St. Elizabeth's") is not entitled to reimbursement as a "special care hospital inpatient unit." St. Elizabeth's appeals the district court's affirmance of the Secretary's determination that earnings on funds that it pays into an employee health benefit trust fund must be used to offset interest expense that the hospital accounts for as an "allowable cost" under Medicare. We reverse as to the concentrated care unit on the ground that the Secretary's decision was supported by substantial evidence. As for the investment income offset, we cannot affirm on the grounds offered by the Secretary. Therefore, see SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we remand this portion of the case to HHS for further action.
 
 I. THE CONCENTRATED CARE UNIT
 A.
 
 2
 The Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. Sec. 1395 et seq., provides hospital insurance benefits to certain classes of people, primarily the elderly.[1] Health care facilities certified as "providers of services" are reimbursed by the federal government for services rendered Medicare beneficiaries, either directly or through a fiscal intermediary. St. Elizabeth's is a Medicare provider of services receiving reimbursement through Blue Cross of Wisconsin ("Blue Cross").
 
 
 3
 For care provided a Medicare beneficiary, St. Elizabeth's is entitled to be reimbursed the lesser of either the "reasonable cost" of the services or the "customary charge" for such services. 42 U.S.C. Sec. 1395f(b). Congress has charged the Secretary with promulgating regulations governing computation of the "reasonable cost" of services, requiring that any method incorporate accurate cost accounting and an accurate allocation of costs between Medicare and non-Medicare patients:
 
 
 4
 The reasonable cost of any service shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services.... Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items of services, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall ... take into account both direct and indirect costs of providers of services in order that, under the methods of determining costs, the costs with respect to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.
 
 
 5
 42 U.S.C. Sec. 1395x(v)(1).
 
 
 6
 The Secretary has promulgated "apportionment" regulations that detail how to allocate costs between Medicare and non-Medicare patients "so that the share borne by the program is based upon actual services received by program beneficiaries," 42 C.F.R. Sec. 405.452(b). Because St. Elizabeth's has more than one hundred beds, it must use the "departmental" method of apportionment. Id. Sec. 405.452(c)(2). Under this method[2] all units within a hospital are classified as either "routine patient care areas" or "intensive care units, coronary care units, and other special care inpatient hospital units" (herinafter "special care units"). A special care unit must meet the following requirements:
 
 
 7
 [T]he unit must be in a hospital, must be one in which the care required is extraordinary and on a concentrated and continuous basis and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but exclude postoperative recovery rooms, postanesthesia recovery rooms, or maternity labor rooms.
 
 Id. Sec. 405.452(d)(10).[3]
 
 8
 The "reasonable" daily cost of services provided to Medicare patients in either a special care unit or the routine care areas is based on an "average cost per diem." The average cost per diem is computed by dividing the total cost of "routine service" (all services save those provided by such "ancillary" departments as x-ray and pharmacy, which traditionally bill separately, see id. Secs. 405.452(d)(2), 405.452(d)(3)) incurred by both Medicare and non-Medicare patients, by the total number of patient days (Medicare and non-Medicare) in that area. Id. Sec. 405.453(d)(7). To this is added a fraction of total patient charges in the ancillary departments. The total is the "reasonable cost" of services. This set of calculations is done separately for each of the special care units in a hospital and then for all of the routine care areas taken together. Thus, whether a particular unit is classified as a routine care area or special care unit may alter the amount of Medicare reimbursement to which a hospital is entitled. St. Elizabeth's believes that it will not receive adequate reimbursement for the care it provides to Medicare patients if its concentrated care unit ("CCU") is classified as a routine care area for apportionment purposes.
 
 B.
 
 9
 St. Elizabeth's CCU is a 21-bed unit, adjacent to but physically separate from its 14-bed intensive care unit, that provides rehabilitation and reorientation to patients suffering from heart trauma. It also cares for stroke patients and other patients who no longer need intensive care but who are not yet ready to return to the routine care wards.
 
 
 10
 Until 1978, St. Elizabeth's treated the CCU as a special care unit for apportionment and reimbursement purposes. In January 1978 Blue Cross conducted a study of per diem costs in Wisconsin hospitals. It found that the average per diem nursing salary and average per diem patient cost in St. Elizabeth's CCU was substantially lower than those in special care units in hospitals of a comparable size. Conversely, it found that the costs in St. Elizabeth's intensive care unit were somewhat higher than the state average for special care units. Blue Cross reported its findings to the Health Care Financing Administration ("HCFA"), the agency within HHS that administers Medicare. The HCFA instructed Blue Cross to examine whether the CCU qualified, under the regulations, as a special care unit.
 
 
 11
 Blue Cross relying on the requirements set forth in 42 C.F.R. Sec. 402.452(d)(10), supra, determined that the CCU did not qualify as a special care unit. Based on this determination, Blue Cross adjusted St. Elizabeth's cost reports for 1975, 1976 and 1977 to reflect the CCU's new status as a routine care area. The difference in reimbursement after adjustment was $34,299, $22,027, and $23,117, respectively, for the three years in question.
 
 
 12
 St. Elizabeth's appealed this adjustment to the Provider Reimbursement Review Board (the "PRRB"), which decided that Blue Cross had erred in classifying the CCU as a routine care area. The Secretary reversed this decision, ruling that the CCU was a routine care area. St. Elizabeth's brought suit in federal court in the Eastern District of Wisconsin, challenging the Secretary's final decision. The district court referred the matter to a magistrate, who recommended reversing the Secretary. Magistrate's Recommendation, No. 82-C-656 (Nov. 2, 1984), at 14. The district court adopted the magistrate's recommendation. St. Elizabeth Hospital, Inc. v. Heckler, No. 82 C 656 (Jan. 30, 1985), at 4. The Secretary appeals.
 
 
 13
 We must examine (1) whether the Secretary's decision that the CCU at St. Elizabeth's does not qualify as a special care unit is supported by substantial evidence and (2) whether the Secretary's interpretation of the apportionment regulations as mandating only two levels of care is arbitrary and capricious.
 
 C.
 
 14
 The magistrate ruled that the Secretary had not shown that his finding was supported by substantial evidence. The Secretary argues that the magistrate, whose recommendation the district court adopted without comment, misapplied our holding in Community Hospital of Indianapolis v. Schweiker, 717 F.2d 372 (7th Cir.1983). In that case we were asked to review the Secretary's determination that a physical rehabilitation center--a hospital unit providing health care and therapy to physically disabled individuals--did not qualify as a special care unit. There, as here, the question was what was meant by the requirement that care provided in such a unit be "extraordinary, concentrated and continuous."[4] We rejected as "not implicit in the plain meaning" of Sec. 405.452(d)(10) the Secretary's contention that in order to qualify as a special care unit a hospital unit had to treat critically ill patients "in immediate life-threatening situations." 717 F.2d at 376. Instead, we held that the regulation required only that "the level of care provided in a special care unit be comparable to the level of care provided patients in ... recognized units." Id. (emphasis supplied). In so doing we rejected the ejusdem generis approach (adopted by several circuits[5]) which would require that all special care units treat the critically ill since those cited in the regulation as examples do. See 717 F.2d at 378 (Wood, J., dissenting). We examined the administrative record and noted that
 
 
 15
 nursing staff-patient ratios and operational costs of the rehabilitation center were much closer to those of the recognized special care units than to those of the Hospital's routine service areas. Moreover, the rehabilitation center, like the recognized special care units, did not employ nurse's aides although such employees are regularly engaged to perform tasks in routine service areas....
 
 
 16
 Id. at 377. We concluded that the level of care provided in the physical rehabilitation center was comparable to that provided in a special care unit, even if the type of care and patient treated was not.
 
 
 17
 In the case before us, as in Community Hospital, the Secretary offered the magistrate comparative data on per diem costs, nursing hours, nursing salaries and depreciation costs. He argued that these tended to show that St. Elizabeth's CCU had operational costs more "comparable" to those in the routine care areas than to those in intensive care, a recognized special care unit. The magistrate agreed with the statistical inference: "A statistical comparison shows that the CCU falls between intensive care and routine.... In most areas the CCU is in closer proximity to routine care than to intensive care." Magistrate's Recommendation at 9. Nonetheless, he held that these comparisons, taken alone,[6] did not provide substantial evidence to support the Secretary's determination that the CCU was not a special care unit. He held that "a 'middle level' of care can still qualify as a special care unit," id. at 9, "where as here the care being provided is not 'routine,' " id. at 10.
 
 
 18
 We agree that the magistrate did not apply Community Hospital correctly. Community Hospital merely held that in deciding whether a hospital unit provides special care the Secretary could not consider dispositive the type of care provided and patient treated; he had to look at the level, or intensity, of care offered. The latter approach would conform to the regulation's language and its purpose, increasing the accuracy of cost allocation.
 
 
 19
 The magistrate properly looked at the same criteria we examined in Community Hospital and determined that the level of care provided in the CCU was not comparable to that provided in one of St. Elizabeth's special care units. But he then ruled that the CCU should be deemed a special care unit because the care offered was not "routine." Routine care cannot be the benchmark in these circumstances. The regulatory scheme recognizes that a continuum of types and levels of care are present in any hospital and creates a threshold, a certain point at which the level of care reaches such an intensity that Medicare accounts for it separately for apportionment purposes. This is special care, or care that is "extraordinary, concentrated, and continuous." All care that falls below that mark is, by definition, routine.[7] It does not matter whether care is considered "routine" in layman's terms; if the care provided in the CCU is not comparable to special care, it is routine. We hold that there was substantial evidence, of the sort we approved in Community Hospital, to support the Secretary's determination that the CCU was not a special care unit.
 
 D.
 
 20
 St. Elizabeth's also suggests that the Secretary's interpretation of the apportionment regulations as mandating only two levels of care is arbitrary and capricious. It does not challenge the regulations themselves (an almost insurmountable burden, since the Secretary's formal rule-making in this field is entitled to "legislative effect," Schweiker v. Gray Panthers, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981)); rather, it argues that the Secretary is bound to assure accurate allocation of costs between Medicare and non-Medicare patients by reading his regulations as authorizing an "intermediate" level of care subject, like special care, to individualized unit cost determinations. Although the Secretary's interpretation of his own regulations is entitled to considerable deference, we are charged with the task of ensuring that this interpretation is consistent with the language and purpose of the regulation.
 
 
 21
 Much of the argument on appeal is over semantics and we believe that the parties' characterizations of their preferred outcomes as involving "two" versus "three" levels of care only serves to confuse the issue. As we stated supra, all care that is not denominated "special care" is considered in the aggregate under the catch-all label "routine care" in determining average cost per diem and hence the reasonable cost of a hospital stay. Each unit that provides "special care" is treated separately, with its own average cost per diem and reasonable reimbursement figure. In one sense, then, St. Elizabeth's is correct in stating that the regulations do not, by their terms, limit reimbursement to two levels of care only. There will be as many reimbursement levels as there are special care units--plus one (routine care). But the Secretary's interpretation is supported by the fact that the regulations mention only special and routine care: no third "level" of care appears in the regulations.
 
 
 22
 What St. Elizabeth's wishes us to do, in effect, is push down the threshold point that divides special care from routine so that the CCU can also be considered separately for apportionment purposes. With the issue before us thus framed, the question is really whether the point at which the cut-off is currently made--that is, the definition of "special care"--is arbitrary, capricious and inconsistent with the purpose of the regulation.
 
 
 23
 Taking a hospital unit out of routine care and making it a special care unit will (if the costs of that unit are, like the CCU's, on the higher end of the routine care spectrum) raise the average recorded cost per diem of Medicare patients in the CCU--and correspondingly lower the average cost per diem of Medicare patients left in a routine care area. If Medicare patients were uniformly spread throughout a hospital and were receiving the average amount of services provided in their respective units, it would not matter how the Secretary divvied up the units for reimbursement. There would be no need for any special care units at all. But common sense tells us that this is not the case and that a higher percentage of elderly patients (hence, Medicare beneficiaries) will be receiving hospital care of a more intensive--and expensive--kind. If this is the case, computing average per diem cost without differentiating between levels of care would put hospitals at risk of not receiving adequate reimbursement for the care they provide Medicare patients.
 
 
 24
 This effect apparently motivated the 1972 amendments to the apportionment regulations, which first adopted the special care unit classification.[8] This scheme allowed the Secretary to provide a more accurate allocation of costs without creating an unmanageable administrative burden. Certain hospital units with significantly higher costs were separated out, but not so many as to destroy the administrative benefits of aggregation. The question is one of balancing further refinement of allocation against increased administrative costs. We are not sure where another threshold point, more reasonable than the one the Secretary has set, would be found. A hospital would always have the incentive to seek to have its higher cost routine care areas (so long as they were disproportionately Medicare-utilized) accounted for as special care units. St. Elizabeth's told us at oral argument that Medicare patients are disproportionately represented in the CCU. Thus, it is to its advantage to have the CCU accounted for separately and receive a correspondingly smaller reimbursement amount for those (fewer) Medicare patients in the remaining routine care areas. Of course, as St. Elizabeth's is at pains to point out, it is to the Secretary's financial benefit to have the CCU remain a routine care area. But this will not always be the case. If the special care threshold were lowered, other areas in a hospital that benefit the hospital by retaining their routine care designation would also be candidates for special care status. These could be typically Medicare-underutilized units, such as narcotics rehabilitation or neonatal care. (Maternity wards, also typically Medicare-underutilized, are required by the regulation to be considered routine care areas. See 42 C.F.R. Sec. 402.452(d)(10)). The fact that special care unit status is not a one-way street suggests that the increased refinement to be achieved by St. Elizabeth's proffered interpretation would probably not be so great as to overcome the increased administrative burdens, and certainly not weighty enough to persuade us that the Secretary's interpretation is unreasonable. Classification for cost purposes is an area where judgment and discretion must always play a significant role.
 
 
 25
 Therefore the judgment insofar as it sets aside the Secretary's classification of the concentrated care unit is reversed.
 
 II. THE INVESTMENT INCOME OFFSET
 
 26
 St. Elizabeth's provides its employees health insurance through a self-funded insurance plan called the St. Elizabeth Hospital Health Benefit Plan. The Plan is administered as an independent trust--the St. Elizabeth Health Trust ("Trust")--into which St. Elizabeth's contributes funds on a regular basis, based on needs projected by an actuary. In its 1975, 1976 and 1977 cost reports, St. Elizabeth's claimed as an allowable cost its contributions into the Trust. The Trust's assets are invested and generate investment income, which must be retained in the Trust and used to pay for employee health care. We must consider here the treatment of this investment income under Medicare's provider reimbursement scheme. (We will also touch upon the treatment of contributions to self-insurance funds, an issue which has not been appealed to this court but which is related to the investment income offset.)
 
 
 27
 In determining which of a hospital's expenses may be included in the reasonable cost of a Medicare patient's hospital stay, "[n]ecessary and proper interest on both current and capital indebtedness is an allowable cost," 42 C.F.R. Sec. 405.419(a). The definition of "necessary" requires that the interest be
 
 
 28
 reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds. Income from funded depreciation or provider's qualified pension fund is not used to reduce interest expense. Interest received as a result of judicial review by a Federal court ... is not used to reduce interest expense.
 
 
 29
 Id. Sec. 405.419(b)(iii). The Secretary has interpreted this regulation as requiring that the income earned by the Trust be offset against and reduce St. Elizabeth's otherwise allowable interest expense.
 
 
 30
 When Blue Cross reopened St. Elizabeth's cost reports for 1975, 1976 and 1977, it denied reimbursement for contributions to the Trust and also denied reimbursement for interest expense to the extent it was offset by income earned by the Trust. St. Elizabeth's appealed both of these issues to the PRRB, which upheld Blue Cross' position on both. The HCFA then affirmed the PRRB, and the district court referred both issues to the magistrate, who recommended affirming the Secretary on both. As for allowing the cost of contributions to the Trust, the magistrate noted that while the applicable regulation states that "premium payments for employee health ... plans" are an allowable cost, the Provider Reimbursement Manual (the "Manual"), which contains the Secretary's interpretation of the regulations, states that when payments are made into a self-insurance fund, the cost of contributions is not allowable. Magistrate's Recommendation at 15. He concluded that it was not arbitrary, capricious or an abuse of discretion for the Secretary to interpret the regulation providing for reimbursement for premiums as applying to commercial insurance policies only. As to the investment income offset, the magistrate cited Manual section 2161B, which states that "the provider's total allowable interest expense under the Medicare program will be offset by income earned by invested insurance reserve funds." He also noted that investment income from employee health benefit self-insurance is not one of the four enumerated exceptions to the general rule of the income-offset regulation and again concluded that the Secretary's interpretation was reasonable. Magistrate's Recommendation at 15-16.
 
 
 31
 The district court adopted the recommendation about the income offset without comment but declined to adopt the Magistrate's recommendation on the treatment of contributions to a self-insurance fund. It rejected the distinction between commercial insurance and self-insurance, finding no warrant in the regulations or in reason and ruled that the amounts contributed into the Trust were allowable. District Court Opinion at 5 ("The payments made by the hospital for its employees' health insurance do not lose their status as 'premiums' ... simply because the insurance plan is self-funded...."). The Secretary apparently accepts this decision as he has not appealed it.
 
 
 32
 St. Elizabeth's, however, appealed the district court's decision on the investment income offset, arguing that it is unreasonable to read the offset regulation as applying to income earned by a trust fund to which St. Elizabeth's has no effective access. The Secretary supports his interpretation of the regulation with the two reasons given by the magistrate, supra: (1) that the offset is required by section 2161B of the Manual and (2) that income from an employee health benefit self-insurance fund is not one of the listed exceptions to the general offset rule.
 
 
 33
 Section 2161B establishes the conditions under which a provider may be reimbursed for "actual losses" met by a self-insurance reserve fund. One of the eight conditions that a plan must meet to receive reimbursement for such losses is that "[t]he provider's total allowable interest expense under the Medicare program ... be offset by income earned by invested insurance reserve funds." Manual, Sec. 2161B(6). For two reasons, however, we do not think that this condition, relied upon by the magistrate and the Secretary, is dispositive of the question before us.
 
 
 34
 First, the Manual was amended during the course of this litigation to add new provisions on the treatment of employee health benefit trust funds. Section 2161B, upon which the Secretary relies, now appears to apply only
 
 
 35
 [w]here a provider maintains a self-insurance program for other than malpractice and comprehensive general liability coverage in conjunction with malpractice coverage, as well as unemployment compensation and workers' compensation coverage coupled with secondary injury coverage, or employee health-insurance coverage, provided it meets the requirements of Sec. 2162.7....
 
 
 36
 Manual, Sec. 2161B (emphasis supplied). New Section 2162 covers "Provider Costs for Malpractice and Comprehensive General Liability Protection, Unemployment Compensation, Workers' Compensation and Employee Health Care Insurance" and subsection 2162.7 sets forth the conditions which self-insurance funds must meet in order to be reimbursed for all payments into the trust fund. These amendments for employee health benefit coverage were added in January 1983, Action Transmittal No. 276, and are effective for all cost reports "under appeal as of or subsequent to January 15, 1983," Manual Sec. 2162.11(c). Therefore, we think there is a real question whether section 2161B still applies to the Trust or whether section 2162, which does not expressly condition reimbursement on an investment income offset, has superseded it.
 
 
 37
 Second, even if section 2162 is not relevant here,[9] the district court's decision in this case casts doubt on the continued applicability of section 2161B to employee health benefit trust funds. This section, as noted, instructs providers how to set up a self-insurance plan so that "actual losses" met by the plan can be reimbursed. But the district court ruled that it was unreasonable to distinguish between commercial insurance and self-insurance and that therefore all contributions made by St. Elizabeth's into the Trust were allowable costs. Therefore, section 2161B is no longer strictly applicable to the St. Elizabeth's Trust: the offset requirement of section 2161B(6) is a condition precedent to a result--reimbursement for actual losses--that St. Elizabeth's no longer wishes to achieve.
 
 
 38
 The Secretary also supports his interpretation of the offset regulation by appealing to its language: the regulation lists four exceptions to a general offset requirement and employee health benefit trust funds is not among them. St. Elizabeth's counters by arguing that when a provider self-insures for malpractice, it need not offset the income earned by the reserve fund: this exception, it points out, is also not among those listed. In support of this claim it points to the requirement in section 2162 that, in order to be reimbursed for all contributions, a malpractice self-insurance fund must ensure that "any income earned by the fund must become part of the fund and used in establishing adequate fund levels." Manual, Sec. 2162.7(B)(6). Since the Trust retains earnings in the same way, St. Elizabeth's argues that it is arbitrary for the Secretary to apply the offset rule to employee health benefit self-insurance funds.
 
 
 39
 No one has explained why the conclusion about the offset follows from the requirement that earnings be retained,[10] but the Secretary does not dispute it. In fact, he seizes upon this requirement to distinguish malpractice self-insurance from employee health self-insurance. Appellant's Reply Brief at 10. However, section 2162 and its requirement that income become part of the fund applies to employee health benefit self-insurance as well. If there is no offset for malpractice funds (as the Secretary's silence suggests), then the Secretary has articulated no reason why there should be an offset for investment income generated by St. Elizabeth's Trust. He cannot rely on the language of the regulation since neither of these forms of self-insurance are expressly exempted from the offset requirement.
 
 
 40
 In sum, neither of the reasons given us by the Secretary seems to support his interpretation of the offset regulation. Therefore, we vacate and remand to the Secretary for further action consistent with this opinion that part of the judgment concerning the investment income offset. On remand, the Secretary will want to consider (1) whether section 2162 of the Manual applies to the Trust; (2) if not, whether section 2161B applies to the Trust in light of the district court's decision to allow the cost of self-insurance "premiums"; and (3) whether malpractice and employee health benefit self-insurance may be distinguished under the regulations.
 
 REVERSED IN PART AND
 REVERSED AND REMANDED IN PART
 
 
 [1]
 Medicare also provides supplementary medical insurance to the elderly and disabled. See 42 U.S.C. Sec. 1395j et seq. This element of the program is not involved in this case
 
 
 [2]
 The regulations describe "departmental" apportionment as follows:
 The ratio of beneficiary charges to total patient charges for the services of each ancillary department is applied to the cost of the department; to this is added the cost of routine service for program beneficiaries, determined on the basis of a separate average cost per diem for general routine patient care areas.... [A]nd in hospitals, a separate average cost per diem for each intensive care unit, coronary care unit, and other special care inpatient hospital units.
 Id. Sec. 405.452(b)(1).
 
 
 [3]
 Section 405.452(d)(10) was amended in 1980. 45 Fed.Reg. 54,757 (1980). Under the amended regulation, effective for cost reporting periods beginning on or after October 1, 1980, only an "intensive care type inpatient hospital unit" qualifies for separate reimbursement. Id. (emphasis supplied). Such a unit furnishes services only to "critically ill" patients and expressly does not include "subintensive" or "intermediate" care units. The case before us, however, involves only the older version quoted in the text
 
 
 [4]
 There, as here, it was agreed that the unit was (1) in a hospital; (2) physically identifiable and separate from general patient care areas; and (3) governed by specific written policies. See 42 C.F.R. Sec. 405.452(d)(10)
 
 
 [5]
 See, e.g., Butler County Memorial Hospital v. Heckler, 780 F.2d 352 (3d Cir.1985); Carraway Methodist Medical Center v. Heckler, 753 F.2d 1006 (11th Cir.1985); St. Elizabeth's Hospital of Boston v. Heckler, 746 F.2d 918 (1st Cir.1984); Psychiatric Institute of Washington, D.C., Inc. v. Schweiker, 669 F.2d 812 (D.C. Cir.1981); White Memorial Medical Center v. Schweiker, 640 F.2d 1126 (9th Cir.1981)
 
 
 [6]
 The Secretary also argued before the magistrate that Community Hospital was wrongly decided and should be ignored. The magistrate rejected this argument and framed the question before him as "if the improper reasons given by the Secretary ... are excluded, and the statistical comparison is not dispositive, is there substantial evidence in the record to support the conclusion that CCU does not qualify as a special care unit?" Magistrate's Recommendation at 10
 Before this court, the Secretary argues that even if the lack of critically ill patients is not dispositive of the CCU's classification, it is nonetheless probative. We do not deny that there is a logical connection--the critically ill need a higher level of medical care than those less seriously ill. But the presence or absence of the critically ill in a unit raises no special presumption as to classification. See Community Hospital, supra.
 
 
 [7]
 This is no doubt why Sec. 405.452 contains no definition for "routine patient care" although it does define special care
 
 
 [8]
 [I]n 1972, the Secretary decided ... to amend the regulations ... to remove from the calculations of routine service costs, the cost incurred in furnishing care in special care units. This was done because the program recognized that the costs of furnishing care in these special care units were significantly higher, due to the need for greater staffing and more specialized equipment, than the costs associated with other patient care areas, including intermediate or subintensive care units. Thus, incorporation of these higher costs with general routine costs would unfairly skew the calculation
 
 
 [45]
 Fed.Reg. 54,757 (1980)
 
 
 [9]
 The parties have not addressed the new provisions (although St. Elizabeth's does contend that they apply to self-insurance for malpractice, see infra). It is possible that the Trust does not meet the requirements imposed on self-insurance funds by section 2162.7 and that therefore the parties deemed this provision irrelevant. According to the Manual, a self-insurance fund that cannot meet the requirements of section 2162.7 is governed by section 2161B. But, as we explain, section 2161B does not appear to support the Secretary's position in this case either
 
 
 [10]
 There is a reasonable argument that keeping income in the fund reduces the level of contributions, which are allowable costs. To that extent, there is an implicit offset. Further, when a provider terminates its participation in Medicare, any excess reserves in the fund (whether from contributions or investment income) must be used to offset allowable costs in the final cost report. Sec. 2162.3B(4). Thus perhaps, section 2162 was designed to make the offset prescribed in the regulations redundant